[Civ. No. 1115.    Third Appellate District.—September 23, 1913.]

CATHERINE KRAMM, as Administratrix of the Estate of Philip Kramm, Deceased, Respondent, v. STOCKTON ELECTRIC RAILROAD COMPANY (a Corporation), Appellant.

APPEAL—RELIEF FROM DEFAULT IN PREPARING AND SERVING BILL OF EXCEPTIONS.—An order relieving the moving party for a new trial from his failure to prepare and serve a bill of exceptions within the time prescribed by law, is not appealable; but the point may be disposed of here, the proceeding being brought up on a bill of exceptions which is embraced in the transcript of the record.

ID.—BILL OF EXCEPTIONS—EXTENSION OF TIME FOR SERVICE.—Orders extending the time for the preparation and service of a proposed bill of exceptions for more than thirty days beyond the time allowed by law, without the consent of the adverse party, are in excess of the jurisdiction of the court.

ID.—STIPULATION EXTENDING TIME—EFFECT AS ESTOPPEL.—But if the adverse party, after such unauthorized extensions, stipulates for a further extension of time, he is estopped to claim a default on the ground that the previous orders were void, if the bill is prepared and served within the time designated in the stipulation.

22 Cal. App.—47

ID.—EXTENSION OF TIME BY STIPULATION—FURTHER EXTENSION BY ORDER OF COURT.—An order of court extending the time for service of the bill of exceptions four days beyond the date fixed by such stipulation, without the consent of the adverse party, is in excess of the jurisdiction of the court, but such party is estopped from making objections on that ground if he accepts the bill and requests and obtains a stipulation extending the time within which to prepare and serve amendments.

ID.—DEFAULT IN SERVING BILL OF EXCEPTIONS—DISCRETION IN GRANTING RELIEF.—A court does not abuse its discretion in relieving the moving party for a new trial from default in preparing and serving his bill of exceptions within the prescribed time, where the service is one day late and this is due to the inadvertence of the person typewriting the bill in omitting important matters not discovered soon enough to make the correction and service in time.

ID.—SETTLEMENT OF BILL OF EXCEPTIONS—RELIEF FROM DEFAULT—SECTION 473 OF THE CODE OF CIVIL PROCEDURE.—The settlement of a bill of exceptions is a "proceeding" within section 473 of the Code of Civil Procedure, and under that section the release of a party from the proceeding taken against him through mistake, inadvertence, etc., is a matter largely within the discretion of the trial court, and its order granting such release will not be disturbed on appeal in the absence of a clear abuse of discretion.

ID.—BILL OF EXCEPTIONS—SERVICE BY AGENCY OF EXPRESS COMPANY.—The service of a bill of exceptions by delivery to an express company for transmission to the attorney of the adverse party in another city, constitutes "personal service." The fact that the person upon whom the service is to be made resides or has his office in a different place from that of the person making the service does not require that the service be made by mail, or preclude a personal service, and the person seeking to make the service can avail himself of any agency, such as Wells, Fargo & Co., or the instrumentality of the post-office department, with as much effect as if he had employed any other messenger. The delivery of the notice through such agency renders the service personal, and the proof of such delivery establishes a personal service.

STREET RAILWAY—ACTION FOR INJURY TO PERSON ON TRACK—EXAMINATION OF JURORS.—In an action to recover for the death of a person struck by a street-car while he was spreading gravel over the street, the following question, addressed to the jurors on their *voir dire* examination is proper: "It being admitted in this case that the deceased was careless in getting upon the railroad track of the defendant street-car company, if the court should instruct you that, notwithstanding his carelessness and neglect in placing himself in a position of danger, and if the motorman in charge of the car, by the exercise of ordinary care, could have prevented the accident, it was his duty to do so, would you follow that instruction?"

Id.—Contributory Negligence—Whether Bars Action Against Railway Company.—If in such action there is evidence that the motorman saw the deceased in a position of peril in time to have prevented the accident by making use of the means within his power, it is for the jury to determine whether the plaintiff is entitled to recover, under the rule of last clear chance, notwithstanding the contributory negligence of the deceased.

Id.—Doctrine of Last Clear Chance—Definition and Recognition.— A person having an opportunity, by the exercise of proper care, to avoid injuring another, must do so, notwithstanding the latter has placed himself in the situation of danger by his own negligence or wrong.

Id.—Action for Death of Person Struck by Car—Examination of Witness.—In an action to recover for the death of a person struck by a street-car, it is proper to ask the witness what he saw after reaching the track where the accident occurred, the purpose of the question being to secure a description of the condition of the track and the situation of the deceased with reference to the car, etc.

Id.—Evidence—Res Gestae—Exclamations.—In such action it is proper for a witness to testify that from her house, a short distance away, she heard the exclamation "Oh!" from the direction of the place of the accident at about the time she heard a "bumping noise" of the car as it seemed to have struck some object.

Id.—Appearance of Car—Examination of Witness Respecting.—In such action it is proper for a witness to state, when asked to describe the appearance of the car, that "the car was carrying a current of wind right ahead of her."

Id.—Noise Preventing Deceased from Hearing Approaching Car— Testimony Respecting.—A witness who was driving a large water wagon may testify as to the weight of the wagon, the purpose of the testimony being to show that the wagon made a loud noise preventing the deceased from hearing the approaching car.

Id.—Expert Testimony—Rate of Speed of Cars or Other Vehicles. The question of the rate of speed of cars or other vehicles does not, strictly speaking, constitute a subject of expert testimony; it involves purely a matter of judgment, and one which it is competent for any person to give testimony upon. Whether the judgment so disclosed is worthy or unworthy of any weight, is a matter solely for the decision of the jury.

Id.—Evidence of Speed of Car—Experience of Witness.—The testimony of a witness with respect to his experience in observing the time in which racing horses, attached to vehicles, covered certain distances, is admissible to show that, having been in the habit of making such observations, he is better able to judge the rate of speed of the car when it approached and struck the decedent than he would otherwise have been.

ID.—ACTION FOR WRONGFUL DEATH—EVIDENCE AS TO DECEDENT'S FAMILY.—In an action for the wrongful death of a man, the testimony of his married daughter that the decedent has a surviving family consisting of his widow, the witness, and three minor children, is admissible. It is proper to show that the deceased left a family who suffered pecuniary loss by reason of his death through the tortious act of the defendant, and to show the extent of such loss with reasonable certainty.

ID.—DAMAGES—WHAT MAY BE CONSIDERED AS ELEMENTS.—While solace for wounded feelings may not be included in the damages awarded, the loss of society, comfort, and care to wife and children, as well as their support, may be considered in so far as they affect pecuniary loss to them by the death of the husband or father.

ID.—CHARACTER OR DISPOSITION OF DECEDENT—EVIDENCE CONCERNING. It is also proper to permit a witness to say that the decedent was "kind and loving" to his minor children.

ID.—AMOUNT OF RECOVERY—WHETHER EXCESSIVE.—A verdict of eight thousand dollars for the plaintiff is not so excessive as to indicate prejudice or passion on the part of the jury, in an action for the death of a man who leaves a widow, a married daughter, and three minor children.

ID.—VERDICT OF JURY—MANNER OF RENDITION—READING BY CLERK.— The reading of a verdict by the clerk, instead of by the foreman of the jury, when the latter has passed it up to the judge and the judge has delivered it to the clerk and ordered him to read it, is not error fatal to the validity of the verdict. The word "rendered," in section 618 of the Code of Civil Procedure, does not mean that it is the duty of the foreman to read the verdict, but that the clerk must read it after it has been "rendered" or returned into the court by the foreman.

APPEAL from a judgment of the Superior Court of San Joaquin County and from an order refusing a new trial. J. A. Plummer, Judge.

The facts are stated in the opinion of the court.

Arthur L. Levinsky, for Appellant.

Jacobs & Flack, and George F. Buck, for Respondent.

HART, J.—Plaintiff's intestate lost his life through the alleged negligence of the defendant, and the purpose of this action is to recover damages therefor. The jury by whom the questions of fact were tried awarded the plaintiff a verdict

in the sum of eight thousand dollars, and this appeal is prosecuted by the defendant from the judgment entered upon said verdict and from the order denying it a new trial.

The accident by which the deceased lost his life occurred in the month of October, 1900, and this action, which was commenced in June, 1903, has had five trials, the first resulting in a verdict in favor of the plaintiff. That verdict was set aside by the granting by the trial court of the defendant's motion for a new trial. In the second trial the court granted the defendant's motion for a nonsuit on the close of the plaintiff's original case, and the plaintiff appealed from the judgment entered upon the order granting said motion. This court reversed said judgment and remanded the case for a trial upon its merits. (*Kramm* v. *Stockton Elec. R. R. Co.*, 3 Cal. App. 606, [86 Pac. 738, 903].) Upon the third trial the plaintiff obtained a verdict, which was set aside and a new trial granted by the trial court. From the order granting said motion the plaintiff took an appeal and this court thereupon rendered judgment affirming the order. (*Kramm* v. *Stockton Elec. R. R. Co.*, 10 Cal. App. 271, [101 Pac. 914].) In the fourth trial the jury disagreed, and the fifth trial is the one with which we are now concerned and as to which it is claimed for a reversal of the judgment and order: 1. That the court erred, to the damage of the defendant, in permitting certain questions to be propounded to certain jurors on their *voir dire* examination; 2. Insufficiency of the evidence to justify the verdict; 3. Error in certain particulars in the court's charge to the jury; 4. Excessive damages; 5. That the court erred in not requiring the foreman of the jury to read the verdict, upon its return, the clerk having performed that function.

The defendant set up contributory negligence as a special defense to the action, claiming that the injuries received by the deceased and from the effect of which he died were proximately caused by his own carelessness, and, therefore, through no fault or negligence of the defendant.

A preliminary objection is urged by the plaintiff against a consideration of the bill of exceptions and the affidavits used by the defendant on its motion for a new trial on the ground that the same were not prepared and served within the time prescribed by law. The same point is made the subject of a

distinct appeal in *Kramm* v. *Stockton Elec. R. R. Co.*, Civil No.
1126, *post,* p. 761, [136 Pac. 534], but the order relieving the
defendant from its alleged default is not one from which an ap-
peal is authorized (*Kaltschmidt* v. *Weber,* 136 Cal. 675, [69
Pac. 497]), hence said appeal has this day been dismissed. The
point may, however, be disposed of here, the proceeding being
brought here on a bill of exceptions which is embraced in the
transcript of the record in this case.

The judgment upon the verdict was entered on the twenty-
second day of July, 1911, and a notice of intention to move for
a new trial filed on July 29, 1911. It appears from the affi-
davits filed by the plaintiff that, at some time after the trial
of the action and before the expiration of the time allowed by
law for that purpose, counsel for the defendant requested one
of the counsel for the plaintiff for a stipulation extending the
time within which he might prepare and serve his bill of
exceptions or statement on motion for a new trial. This re-
quest was refused, and thereupon counsel for the defendant,
on the eighth day of August, 1911, applied to the court for
an order extending the time to and including the first day
of September, 1911, which application was granted. It fur-
ther likewise appears that the court thereafter made several
other orders extending the time within which the bill or state-
ment might be prepared and served, whereby the time for
that purpose was extended to the fourteenth day of Novem-
ber, 1911, inclusive. The orders so made after the making
of the first order above referred to, although not objected to
by counsel for the plaintiff, were not affirmatively assented
to by them. (Code Civ. Proc., sec. 1054.) On the tenth day
of November, 1911, however—the day preceding that on which
the time granted by the last order of the court was to expire—
one of the attorneys for the plaintiff stipulated that counsel
for the defendant might have until and including the twenty-
fourth day of November, 1911, within which to prepare and
serve his bill or statement.

It appears that the bill was completed and ready for service
on the twenty-fourth day of November, but that the attorneys
for the plaintiff were then located and maintained their offices
in the city of Los Angeles, in which city the service was, there-
fore, required to be made. Obviously, the service could not
be made on said day, and the court, upon the application of

the defendant, extended the time for the service to and including the twenty-ninth day of November, 1911—four days beyond the date to which the time had been extended by the stipulation of the attorneys. On the twenty-fourth day of November the attorney for the defendant deposited the bill or statement, addressed to the attorneys for the plaintiff at Los Angeles, with Wells, Fargo & Co's. express, at Stockton, and thus the document was transmitted to the plaintiff's attorneys.

It is further made to appear that the bill was received by the attorneys for the plaintiff on the twenty-ninth day of November, 1911, and it also appears that in the letter to the attorney for the defendant acknowledging the receipt of the bill, the attorneys for the plaintiff inclosed the draft of a stipulation whereby they were to be given thirty days within which to prepare and serve proposed amendments to said proposed bill of exceptions and requested the attorney for the defendant to sign the same, and that said stipulation was so signed. Thereafter, and on the fourteenth day of December, 1911, counsel for the plaintiff obtained from the court an order extending the time to thirty days from and after said date within which to prepare and serve proposed amendments to the bill or statement as prepared and served by the defendant.

The plaintiff thereafter interposed a motion to disallow and strike out the defendant's bill of exceptions, etc., on the ground above stated, and at the same time the defendant gave notice of motion to be relieved of the default claimed against it in its alleged failure to serve its proposed bill of exceptions on the ground of inadvertence and excusable neglect, etc. (Code Civ. Proc., sec. 473.)

The plaintiff makes two points against the legality of the proceedings allowing and settling the bill of exceptions, viz.: 1. That (as above stated) the bill was not prepared and served within the time required by law; 2. That, assuming that it was so prepared and served, the service was illegal, because the defendant deposited the bill with Wells, Fargo & Co's. express in the place of the United States post-office for transmission, and that substituted service cannot be secured in that way. (Code Civ. Proc., secs. 1011, subd. 1, 1012, and 1013.)

It is necessarily to be conceded that the court was without power to extend the time for more than thirty days beyond that allowed by law without the consent of the plaintiff. (Code Civ. Proc., sec. 1054; *Cameron* v. *Arcata etc. R. R. Co.,* 129 Cal. 279, [61 Pac. 955]; *Bunnel* v. *Stockton,* 83 Cal. 319, [23 Pac. 301]; *Bryan* v. *Maume,* 28 Cal. 238.) It follows that the several orders made by the court extending the time after the first order was made were void because in excess of the authority of the court. But we think that the stipulation entered into by the attorneys for the plaintiff on the tenth day of November, and after the orders referred to were made by the court, should be held to operate as an acquiescence in and virtually a consent by said attorneys to all the orders theretofore made by the court. At any rate, we think that where, as here, the court has made orders extending time to do an act or to prepare and serve a bill of exceptions when its power to do so has been exhausted and thereafter the "adverse party" by stipulation consents to a further extension of time, the latter should be held to have waived the right to claim and to be estopped from claiming a default as against the other party on the ground that the previous orders were void, where the latter has performed the act or prepared and served his bill within the time designated in the stipulation.

The allowance by the court of the four days' more time after the bill had been completed within which to serve it upon the attorneys for the plaintiff in Los Angeles without the consent of the latter was clearly in excess of the power of the court; but, as has been shown, the attorneys for the plaintiff not only accepted the bill but requested of and secured from the defendant a stipulation granting to them thirty days within which to prepare and serve their proposed amendments. Thus, we think, the plaintiff waived any right she might otherwise have had to object to the bill on the ground that it was not served within time, and should be held to be estopped from objecting to the allowance and settlement of the bill on that ground. The acceptance of the proposed bill by the plaintiff was, in our judgment, tantamount to the giving of her consent to the order of the court allowing the four days' additional time referred to.

But, independently of the foregoing considerations, we are unable to say, upon the record appertaining to the point under

present review, that the court abused its discretion in grant-
ing the defendant relief from its claimed default in prepar-
ing and serving its bill of exceptions within time.    In his
affidavit, counsel for the defendant declares that the bill
would have been completed and ready to be started on its way
to the attorneys for the plaintiff in Los Angeles on the twenty-
third day of November but for certain important matters—
testimony, etc.—inadvertently left out of the bill by his sten-
ographer, to whom the work of putting the same in typewrit-
ing had been committed.    He states that on said day he was
engaged in the trial of a case in court and that on his return
to his office he discovered for the first time that the omissions
had been made; that it required so much time to make the
corrections or to add to the bill the omitted matter that he
was delayed one day in sending it on its way to the attorneys
for the plaintiff, thus making it impossible to reach said attor-
neys before the expiration of the time—the 24th of Novem-
ber—granted to him by them.

As stated, upon the foregoing showing, which appears to be
reasonable, it cannot justly be said that the action of the court
relieving the defendant from its default, assuming it to have
been in default in the matter, involved an abuse of the dis-
cretion with which a trial court is clothed in such cases.    In
*Banta* v. *Siller,* 121 Cal. 416, [53 Pac. 935], which involved
the consideration of a similar proceeding as the one here, the
defendant having been in default in the matter of the pres-
entation of the proposed statement and amendments to the
judge, and relieved from such default upon the ground of
inadvertence and excusable neglect, the court said: "As was
held in *Stonesifer* v. *Kilburn,* 94 Cal. 33, [29 Pac. 332], the
settlement of a statement is a 'proceeding' within section 473
of the Code of Civil Procedure; and under that section the
release of a party from a proceeding taken against him
through mistake, inadvertence, etc., is a matter largely within
the discretion of the trial court.    An order granting such
release will not be disturbed here, unless it clearly appears
that the court or judge was guilty of gross abuse of discretion
in making it.    Indeed, it has been frequently said here that
in cases of doubt the court ought to resolve the doubt in favor
of the application so that the full merits of the litigation might
be presented," citing a number of California cases.

The contention that the service of the proposed bill of exceptions was invalid, because it was transmitted to the attorneys for the plaintiff through the agency of Wells, Fargo & Co., cannot be upheld. The delivery of the bill of exceptions to said attorneys by Wells, Fargo & Co. made the service a personal service. "The fact that the person upon whom the service is to be made resides or has his office in a different place from that of the person making the service does not require that the service be made by mail, or preclude a personal service, and the person seeking to make the service can avail himself of any agency, such as Wells, Fargo & Co., or the instrumentality of the post-office department, with as much effect as if he had employed any other messenger. The delivery of the notice through such agency renders the service personal, and the proof of such delivery establishes a personal service." (*Heinlen* v. *Heilbron,* 94 Cal. 636, 640, [30 Pac. 8].)

We hold that the action of the court in allowing and settling the bill was proper, and we now proceed to a review of the merits of the case.

1. The following is typical of the several questions asked by counsel for the plaintiff of certain jurors upon their *voir dire* examination, which questions the defendant insists were improper and prejudiced its rights in that thereby it was forced to exhaust all its peremptory challenges and was, therefore, compelled to complete the panel without the privilege of objecting to certain jurors except upon special grounds which it failed to develop: "It being admitted in this case that the deceased was careless in getting upon the railroad track of the defendant street-car company, if the court should instruct you that, notwithstanding his carelessness and neglect in placing himself in a position of danger, and if the motorman in charge of the car, by the exercise of ordinary care, could have prevented the accident, it was his duty to do so, would you follow that instruction?"

The foregoing question involves, we think, a correct statement of the theory upon which the plaintiff relied for a recovery. As will be more particularly shown hereafter, the deceased was standing on the defendant's street-car track when he was struck by a car traveling over said track and sustained the injuries resulting in his death, and, as is to be

implied from the above question to the jurors, the plaintiff
admitted, at the beginning of the trial, that, in stepping upon
the track, the deceased was guilty of negligence, claiming,
however, that the evidence would and does show that the
motorman saw the deceased on the track in ample time to have
stopped the car and have prevented the accident by the exer-
cise of ordinary care. In other words, the plaintiff, conced-
ing negligence in the act of the deceased in stepping upon the
track, relied upon the doctrine of the "last clear opportun-
ity"—that is, that the motorman, having discovered and
realized the deceased's perilous situation, could have pre-
vented the accident and its consequences by the exercise of
ordinary care. (*Zipperlen* v. *Southern Pacific Co.*, 7 Cal.
App. 208, [93 Pac. 1049]; *Bennichsen* v. *Market St. Ry. Co.*,
149 Cal. 22, [84 Pac. 420].) The question above quoted and
other questions of a like character which the court permitted
the plaintiff to propound to the jurors did not, as counsel for
the defendant assert is true, call for an unqualified statement
of what the verdict would be in advance of the taking of the
testimony. The questions were obviously hypothetical, con-
taining a brief and, as before declared, a correct enunciation
of the rule applicable to a personal injury case in which, as
is the claim here, although the injured party voluntarily
placed himself in a position of peril, and was guilty of negli-
gence in so doing, still, if the party responsible for the injuries
could, by the use of ordinary care, have avoided the accident
whereby they were inflicted and failed to do so, he is guilty
of negligence for which the law will hold him liable. Indeed,
the questions objected to amounted to no more than asking
the veniremen whether they would follow the instructions of
the court.

2. The facts brought out by the evidence at the trial with
which the present appeals are concerned are substantially the
same as those adduced at the former trials of this action, and
a full and correct statement of them will be found in the
opinions filed in the former appeals of this case, above re-
ferred to. We shall, nevertheless, restate the facts here in
a general way and specially refer, briefly, to certain of the
testimony.

The deceased, Philip Kramm, was the husband of the plain-
tiff. They were, at the time that the deceased lost his life,

the parents of four minor children, one daughter and three sons, aged, respectively, twenty, sixteen, fourteen, and eleven years. The deceased, on the day of his death, as he had been for some time previously, was in the employ of the county of San Joaquin, having been engaged in spreading gravel over the roads and streets therein. At the time of the accident, he was employed in this service on California Street, over and along which the street-car track of the defendant is located. Over said track the defendant ran its street-cars. While the deceased was engaged as stated, one Looper, also employed by said county as the driver of a water wagon, used for the purpose of sprinkling or watering the roads and streets, came along with his wagon, having been instructed to sprinkle water on the gravel, which was being spread over California Street by the deceased, for the purpose of packing it down and solidifying it. As Looper, driving in a northerly direction on said street, reached the point where the deceased was working, the latter, in order to avoid collision with the horses and wagon, stepped back on to the street-car track and remained there until after the wagon had passed, when he again stepped into the street. Looper sprinkled as far as the gravel extended on the street and then turned his horses and started in a southerly direction over the same ground, and as he approached the point where the deceased was engaged in spreading the gravel, the latter again stepped back upon the car track to let Looper pass. As the latter was passing the deceased the two engaged in conversation concerning the quantity of water which was required for the gravel, "the team moving and the water running from the sprinkler as they talked." The deceased was then leaning on his shovel and rake and was facing northeast, with his back toward the south. At about this time Looper observed a car traveling on California Street in a northerly direction and toward the deceased. It appears that the appearance of the car startled Looper's horses, they making a quick and sudden jerk. Looper exclaimed to the deceased, "Look out there, old boy, for the car," and at the same time turned his attention to the horses which, from having been frightened, had suddenly left the part of the street on which the gravel was spread. "By the time I looked around—stopped my team, looked around," testified Looper, "and I seen his hat lying behind the car. I

jumped off as quick as I could.    I thought he was under the
car probably, and I jumped off of my team—off of my wagon
and ran around, and he was lying under the west front
wheels."    A number of people, most of whom lived in close
proximity to the place where the accident occurred, immedi-
ately gathered at the scene of the accident, and the body of the
deceased, mangled in a horrible manner, was removed from
the track.    The deceased passed away shortly after his body
was removed from the track.

Looper testified that the running of the water from the
sprinkler on the gravel and the passing of the wagon and
horses over the gravel made considerable noise.    He said that
the car was going at the rate of fifteen or twenty miles an hour
when he first observed it and at the time he cautioned the de-
ceased of its coming, and that it was then within fifty or sixty
feet of where the deceased stood.    The car, he said, "was car-
rying a current of wind right ahead of her. . . . It was bob-
bing up and down."    He said that the deceased remained in
the same position on the track from the time he stepped upon
it after the horses and wagon had turned and started in a
southerly direction over the gravel until he was struck by the
car.    He continued: "After the car moved away . . . I
stepped the distance from where . . . they had drug him.
. . . You could see very plainly, you know, from where the
car struck him; it might have knocked him a good ways before
he struck, but anyway I stepped the dragged place, where
they dragged him there, and it was five or six steps—between
15 and 18 feet."    The witness further testified that if the
deceased had seen the car when he (witness) first saw it and
"had been quick" he might have jumped off the track,
although even then, he said, there was not room enough be-
tween the track and the wagon for the deceased to have
avoided collision with the car.    Looper also stated that he
did not hear the motorman ring the bell or give any other
warning of the approach of the car.

The witness Barnhart, who resided near the point at which
the accident happened, and who was at his home at that time,
saw the car as it was approaching the deceased just before the
latter was struck.    He said that the car was going at full
speed; that when the car was so near the deceased that he
could see but a "streak of daylight" between the front of the

car and the deceased, he observed that the brake handle was in a vertical position, although at about the same instant of time, he said, the motorman appeared to be in the act of applying the brakes. He proceeded: "I remember hearing the noise made by the body striking against the metal front of the car. I was about 260 feet from the car. . . . The body seemed to be lifted, as though it had gone off its feet and had gone up and gone down. . . . It went forward and slightly out." He said that he heard the car bell ring but once and that was when the car was at a point some six feet north of the south line of Hazel Street, the accident having occurred at a point about half way between said street and the next street on the north (Locust) intersecting California Street. He declared that the speed of the car did not seem to have been slackened or lessened until after it struck the deceased. "The car was rocking—was running along at full speed—and was rocking as those old cars did when running at that speed. . . . I lived on Hazel Street in the vicinity of those cars for eight years before this, and had observed the speed of the cars running there daily. . . . My estimate of the speed was some place between 15 to 16 or 18 miles. By full speed I mean a speed obtained on the older cars by throwing the controller around full thing."

Other witnesses testified that the car was going at full speed and that the motorman failed to ring the bell.

The witnesses, Williams and Morris, who had worked for the defendant ten and nine years, respectively, in the capacity of both conductor and motorman, testified that the car which ran over the deceased had, in addition to a brake, a reverse, the latter being the most effectual for stopping the car in case of a sudden emergency. "When you throw on the reverse," said Williams, "it starts the wheels in the other direction; it stops it. In other words, it is a quicker way of stopping the car than that of using the brake, if the track is dry. Car 25 (the one which struck the deceased) has five notches for putting on the current. If three notches were on, I think a man could stop it in 15 feet, something like that. . . . If five notches were turned on, I think you could stop a car in about 50 feet, by the use of the brake, and by the use of the reverse, about 10 feet less than that. The reverse is used in the case of accident, for the purpose of preventing accidents."

Pickering, the motorman operating the car at the time of the accident, said that he first observed the deceased opposite the water wagon when the car rounded the curve on California Street. This curve, it is conceded, is about six hundred and fifty feet from the point where the deceased stood when struck by the car. The deceased, he said, appeared to be in conversation with Looper. "While I was on this curve," the witness continued, "I rang the bell and Mr. Kramm backed across the track. That is, I suppose I was within 100 feet, more or less—started to back across the track; he got within, probably, two-thirds of the way across the track. I was within—the car was within about twelve or fourteen feet, ten or twelve feet at that time, I should judge, between ten and twelve feet when he hesitated and the car struck him." He said that he saw Kramm "at all times from the time he first started back on the track until he was struck." Q. "Did Kramm seem to notice you when you rang the bell? A. Well, I could not say; the man backed across the track—started to back across the track, and stopped; I could not say positively whether he noticed me or not; I didn't see him look at me or look at the car. . . . Q. Within what distance did you stop the car after putting on the brakes? A. I should judge from 3 to 5 feet, somewhere along there, from the front end of the car to the front wheel, that was the distance the car went."

The testimony further discloses that California Street, which runs in a northerly direction, bearing westerly at the curve referred to, passes over perfectly level ground, and that the day on which the accident happened was bright and "sunshiny," so that there was nothing to prevent the motorman from clearly observing any object which might have been on the track before him for the distance between said curve and the point on the track at which the deceased stood when struck.

The above synopsis of the testimony is sufficient to show that the position of the defendant that the verdict is without sufficient support cannot be sustained.

As seen, the deceased was standing with his back toward the direction from which the car was going. He was in conversation with Looper and with his mind thus occupied and with the noise produced by the moving of the horses and wagon over the gravel and the water falling from the sprinkler attached to the wagon, it is manifest that he neither saw nor

heard the car, nor was he aware of its near approach. Indeed, it is very clear, from Looper's testimony, that neither he nor the deceased observed the approach of the car until it had reached a point in such close proximity to the place where the deceased was standing as to make escape impossible, at the rate of speed at which the car was traveling.

It cannot be doubted that the jury were warranted in finding that the motorman had ample opportunity to have stopped the car long before the point where the deceased stood was reached. He saw the latter when his car turned the curve, a distance of six hundred and fifty feet from where Kramm was standing. He saw him at all times after that and until the car struck him. The motorman admitted this. It is true that he testified that Kramm, after the bell was rung, started to back off the track. This testimony was flatly contradicted by Looper, however, who said that the deceased never moved from the position he originally took on the track; but, assuming that the motorman was correct in his statement that the deceased started to leave the track, still the evidence is such that the jury were justified in finding that the car could have been stopped after it had approached within twelve or fourteen feet of the deceased, the car being that distance from the deceased when, according to the motorman, the former hesitated on the track after moving backward a short distance. As has been shown, there is evidence that the car was moving at full speed from the time it rounded the curve, at which point the motorman first noticed or saw the deceased, and that this rate of speed was not slackened or diminished, nor any attempt made by the motorman to reduce it. That there was some reason for believing this to have been the case, is shown by the testimony strongly tending to disclose that the body of the deceased was dragged over the track by the car for a distance of some seventeen feet and by the testimony of the motorman himself that he stopped the car, after applying the brakes, within a distance of from three to five feet. It does not appear that the motorman used the "reverse," whereby, according to the testimony of the witnesses who testified on that subject for both the plaintiff and the defendant, the car could have been stopped much more quickly than by means of the brakes.

It must be taken as proved that the car was traveling at an unusual rate of speed (*Lee* v. *Market St. Ry. Co.*, 135 Cal. 294, [67 Pac. 765]), and that the motorman did not reduce the speed until after the car struck the deceased. At any rate, in our judgment, clearly the record discloses plenty of evidence from which the jury were legally authorized to find that the motorman saw the deceased in a situation of peril in ample time to have prevented the accident had he made proper use of the means in his power to have done so, and the case presented here is, therefore, plainly one for the jury upon the question whether, notwithstanding the negligence of the deceased, the fatal accident would have occurred but for the negligence of the defendant or its agent. It will not be disputed that it is a "principle, now firmly established in this state, that a party having an opportunity by the exercise of proper care to avoid injuring another must do so, notwithstanding the latter has placed himself in the situation of danger by his own negligence or wrong," (*Fox* v. *Oakland Con. St. Ry.*, 118 Cal. 62, [62 Am. St. Rep. 216, 50 Pac. 25]; *Lee* v. *Market St. Ry. Co.*, 135 Cal. 295, [67 Pac. 765]; *Zipperlen* v. *Southern Pacific Co.*, 7 Cal. App. 206, [93 Pac. 1049]), and a review of the evidence in this case will leave no room for doubting that the jury were fully justified in finding that the evidence brought the act of the defendant in causing the death of Kramm within the ban of the doctrine thus enunciated.

The witness, Barnhart, was allowed to state, over objection by the defendant, what he saw after reaching the track where the accident occurred, the purpose of the question being to secure a description of the condition of the track and the situation of the body of the deceased with reference to the car, etc. Barnhart saw the accident from a short distance away from the track and immediately ran to the scene thereof. We can perceive no possible impropriety in this testimony.

3. The witness, Tulan, from her house, a short distance away, heard the exclamation, "Oh!" proceed from the direction of the place where the accident occurred at about the same time she heard the "bumping noise" of the car as it seemed to have struck some object. This testimony was manifestly for the purpose of showing that the deceased uttered the exclamation referred to. We can see nothing improper in

the testimony. If such an exclamation was uttered by the deceased when struck by the car, evidence of that fact was admissible under the rule of *res gestae.* But the defendant does not deny that its car struck the deceased and thus produced his death, and the mere fact that, simultaneously with being struck, he uttered an exclamation indicating that he had been injured and was in pain by reason thereof could tend to prove nothing more than the infliction of the injury and the experiencing of consequent pain. It would not, as counsel contends was its effect, necessarily tend to prove that the body was dragged a considerable distance by the car, nor by whose negligence—whether that of the deceased or that of the defendant—the accident was proximately caused.

4. It is next objected that the court erred by its refusal to strike out the statement of the witness, Looper, that "the car was carrying a current of wind right ahead of her." The ground of the motion to strike out was that the answer was not responsive to this question: "Describe the appearance of the car as you saw it when you turned?" referring to the time immediately after which Looper had cautioned the deceased of the approach of the car. The statement was partly descriptive of the car in action and the ruling was proper. Indeed, the question must have had sole reference to the rate of speed at which the car was moving, as its appearance otherwise, before reaching the deceased, could have had no significant bearing upon the main issue in the case.

5. There was no legal impropriety in the ruling, to which exception was taken and is here urged by the defendant, whereby Looper was permitted to give the weight of the wagon he was driving when loaded with water. The manifest object of this testimony was to show that the large water wagon, containing as it did a large quantity of water, as it passed over the freshly graveled street, sprinkling water thereon, made a loud noise, and that thus the deceased was prevented, to some extent, from hearing the noise of the approaching car.

6. Looper was asked and allowed to answer, against the objection of the defendant, a number of questions, the apparent purpose of which was to qualify him to give an opinion upon the rate of speed with which the car was running when it came in contact with the body of Kramm. He stated that he had owned and then owned some fast horses, belonging to

the racing class, and that thus he became accustomed to taking and observing the time within which horses, attached to vehicles, would cover certain distances. By such observations and experience, he was able to form an approximately accurate judgment as to the rate of speed at which any kind of vehicle might travel by merely observing it as it passed along.

Counsel for the defendant contends that questions touching the speed of street-cars or trains do not involve subjects of scientific inquiry, hence the testimony of Looper as to his experience and observation in the matter of noting the speed of horses or vehicles, drawn by horses, or the rate of speed with which a steam train or a street electric car might travel was incompetent and prejudicial. We think counsel is right when he says that the question of the rate of speed at which a train of cars or other vehicle may travel does not, strictly speaking, constitute a subject of expert testimony. Section 1870, subdivision 9, of the Code of Civil Procedure declares that the opinion of a witness on a question of *science, art,* or *trade,* when he is skilled therein, may be given in evidence. The question as to the rate of speed at which a train of cars or other vehicles may be traveling is not one of science, or of art or of trade, within the meaning of these terms as they are used in said section, but involves purely a matter of judgment and one which it is competent for any person to give testimony upon, and whether the judgment so disclosed is worthy or unworthy of any weight, is a matter solely for the decision of the jury upon a consideration of the opportunity of the witness for observing the train or the vehicle as it passed along, the state of his mind at the time, the degree of intelligence which he appears to possess and whether he appears to be unbiased or otherwise.

But the testimony of Looper with respect to his experience in noting time or the speed at which vehicles, drawn by racing horses, had traveled over certain distances, was not offered or received for the purpose of qualifying him as an expert upon that subject, but merely to show that, having been in the habit of making such observations, he was the better able to form a more reliable judgment as to the rate or speed of the car when it approached and struck Kramm than perhaps he would otherwise have been.

The case of *Grand Rapids and Indiana.R. R. Co.* v. *Huntley,* 38 Mich. 537, [31 Am. Rep. 321], cited by the defendant in support of its position, does not hold that the testimony objected to here is incompetent, nor that an ordinary witness may not give his opinion as to the speed of a train. To the contrary, it is there held that, while questions relative to the speed of trains are "not properly scientific inquiries," yet they "were not beyond the competency of ordinary witnesses who had means and *habits* of observation." In the case at bar, the witness not only had the means but, as shown, the *habit* of observation. Nor is there anything said in the California cases cited by counsel which sustains him in the assertion that the challenged testimony was not proper for the purpose of showing that Looper was capable of forming an approximately accurate opinion as to the rate of speed of the car. See cases referred to, viz.: *Sappenfield* v. *Market St. etc. R. R. Co.,* 91 Cal. 48, 59, [27 Pac. 590] ; *Fairbanks* v. *Hughson,* 58 Cal. 314; *Pacheco* v. *Judson Mfg. Co.,* 113 Cal. 541, [45 Pac. 833.]

7. The testimony of the married daughter of the deceased that the family left by the latter consisted of his widow, the witness and three minor children was not objectionable, and the cases of *Simoneau* v. *Pacific Electric Ry.,* 159 Cal. 494, [115 Pac. 320], and *Green* v. *Southern Pacific Co.,* 122 Cal. 563, [55 Pac. 577], do not so hold. In the first mentioned case, the widow of the deceased, the latter having been injured and killed by one of the cars of the defendant as he was walking across its railroad track, was permitted to testify, against the objection of the defendant, that one of the children of herself and the deceased was crippled in the right arm and had been under a surgeon's care for seven or eight months, and that another child was afflicted with a serious congenital defect in one of her shoulder blades and had been "doctored for a 'good many years' and was still under the doctor's care." In the Green case, the trial court allowed evidence of the poverty of one of the plaintiffs, the action having been brought by the widow and children of the deceased. The testimony in both cases was, with obvious legal propriety, held to be inadmissible, since, clearly, neither the physical affliction of the children in the one case nor the poverty of the child in the other constituted an element of the

damage sustained by the complaining parties. Obviously, a party charged with wrongfully committing a personal injury upon or producing the death of another cannot be held responsible for the physical or financial handicaps of the family of the latter which existed before or at the time the injury was inflicted or the death produced. In the case at bar, however, the proposition is very much different from those presented in the cases above referred to. It was strictly proper in this case to show that the deceased left a family who had suffered pecuniary loss by reason of his death through the tortious act of the defendant, and to show the extent of such loss with reasonable certainty. In order to determine such loss, the jury were entitled to be informed of whom said family consisted—whether of persons who had never received pecuniary assistance from the deceased or who were not dependent upon him for nurture, care, and support, or of persons who had received such assistance and were so dependent, and would, by reason of their minority and consequent helplessness, have still required and been entitled to such assistance and care from him, had he not lost his life. (*Chicago & A. R. A. Co.* v. *Shannon*, 43 Ill. 338; Sedgwick on Damages, 8th ed., sec. 579; *Simoneau* v. *Pacific Elec. Ry.*, 159 Cal. 494, [115 Pac. 320].) As is said in the Simoneau case: "While solace for wounded feelings may not be included in the damages awarded, the loss of society, comfort, and *care* to wife *and children, as well as their support* (italics ours) may be considered in so far as they affect pecuniary loss to them by the death of the husband or father." (See, also, *Beeson* v. *Green Mountain G. M. Co.*, 57 Cal. 20, 38, and *Green* v. *Southern Pacific Co.*, 122 Cal. 563, [55 Pac. 577].)

Nor was it error to permit the same witness to say that the deceased was "kind and loving" to his minor children. As has been shown, the loss to the children of the society, comfort, and care of a parent by his or her death through the wrongful act of another may be shown as entering into the pecuniary loss thereby suffered, and such a consideration would obviously cut little, if any, figure in the estimation of such loss if the conduct of the parent toward his minor children were the opposite of that described by the witness. In *Beeson* v. *Green Mountain G. M. Co.*, 57 Cal. 20, 38, it is said: "We think that the social and domestic relations of the

parties, their kindly demeanor toward each other, the society, were parts of 'all the circumstances of the case' for the jury to take into consideration in estimating what damage would be just, from a pecuniary point of view, especially as there is nothing in the case to show that the jury were instructed that they might give damages by way of solace." (See *Matthews* v. *Warner*, 29 Gratt. (Va.) 570, [26 Am. Rep. 396], and *Baltimore & O. R. R. Co.* v. *Noell*, 32 Gratt. (Va.) 394.)

There are some other exceptions to the rulings of the court upon the evidence, but, after a careful examination of them, we do not regard them as of sufficient importance to require special notice in this opinion.

8. Numerous alleged errors are pointed out by the defendant in the action of the court in giving and refusing to allow certain instructions. We can see no necessity for reviewing these assignments in detail. It is enough to say generally that the court, in its charge, declared to the jury correctly and in clear language every principle of law pertinent to the issues made by the pleadings and the proofs. It may further be observed that the instructions proposed by the defendant and rejected by the court contained no principle or rule of law applicable to the issues which the court did not declare in its charge to the jury. It may also be remarked that there is nothing in the language of any of the instructions submitted by the court to the jury which justifies the criticism of counsel for the defendant "that the jury was virtually told by said instructions that, notwithstanding the fact that the deceased was guilty of contributory negligence, and placed himself in a position of danger, the burden was shifted to the defendant." The court, after first declaring that the plaintiff admitted that the deceased was guilty of contributory negligence, stated, with clearness and accuracy, the rule applicable to the doctrine of the "last clear opportunity," invoked by the plaintiff. Nowhere did the court say or intimate that the burden rested upon or was shifted to the defendant to prove that it was not negligent, or, in other words, that it did not, having knowledge of the perilous position of the deceased, exercise ordinary care to prevent the accident by which he was injured and killed. To the contrary, the court in effect said to the jury that, to sustain the complaint, it

was requisite for the plaintiff to prove the affirmative of the issue by a preponderance of the evidence, the obvious meaning of which is that the burden of proving the charge that the negligence of the defendant was the proximate cause of the death of Kramm wholly rested on the plaintiff.

9. We cannot say that the verdict is excessive. "A verdict in this character of cases can only be disturbed where the amount awarded, in view of the evidence, is so excessive as to be apparently the result either of passion or prejudice on the part of the jury." (*Valente* v. *Sierra Railway Co.*, 158 Cal. 412, 419, [111 Pac. 95].) There is nothing in this record indicating that the verdict was the culmination of either passion or prejudice in the jury. It must, therefore, be assumed that the jury, having found upon sufficient evidence that the death of the deceased was proximately occasioned by the culpable negligence of the defendant, based its award of damages entirely upon a consideration of the great loss sustained by the family of the deceased by the death of him upon whom they depended and had the right to depend for that care and support which the evidence apparently shows that he was capable of affording them. The observations of the learned justice who wrote the opinion in the Valente case, to be found on page 419 [of 158 Cal.] thereof, are peculiarly applicable to the case here with respect to the question of damages.

10. There is no merit in the proposition, advanced by the defendant, that it was error fatal to the validity of the verdict for the clerk to have read the verdict "in the place of its having been rendered by the foreman," as provided by section 618 of the Code of Civil Procedure. It appears from the record that, when the jury came into court after deliberating upon the case, the court, after asking whether they had agreed upon a verdict and receiving an affirmative reply from the foreman, requested the latter to pass the verdict up to the court. The foreman obeyed this request, and the judge, after inspecting the verdict, delivered it to the clerk and ordered him to read it, whereupon the clerk read the verdict and thereupon counsel for the defendant asked for a poll of the jury, which was granted, each of the jurors, as his name was called, stating that the verdict as read was his verdict. The court thereupon ordered the verdict to be entered of record,

after which counsel for the defendant noted and reserved an exception to the reading of the verdict by the clerk.

Section 618 of the Code of Civil Procedure, among other things, provides that "when the jury, or three-fourths of them, have agreed upon a verdict, they must be conducted into court, their names called by the clerk, and *the verdict rendered by their foreman;* the verdict must be in writing, signed by the foreman, and *must be read by the clerk to the jury,* and the inquiry made whether it is their verdict."

Counsel's argument in support of this point of necessity assumes that the word "rendered," as used in said section, means that it is the duty of the foreman to *read* the verdict. But the section does not say so. As plainly as it could be said, it is declared that the clerk must read the verdict after it has been "rendered" or *returned* into court by the foreman, which is the evident meaning of the word "rendered" as it is used in the section. The legislature could not have intended so unnecessary a thing as that the verdict should be read by both the foreman of the jury and the clerk of the court, and if it had it would have plainly so declared. The case of *Blum* v. *Pate,* 20 Cal. 69, cited by the defendant, merely holds that the recordation of the verdict by the clerk before reading it to the jury and thereupon inquiring whether it is their verdict, is an irregularity. The case does not sustain counsel's interpretation of the word "rendered," as it is employed in the section.

We have discovered no substantial reason for interfering with either the judgment or the order appealed from, and both are accordingly affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 22, 1913.