Filed 10/7/14  P. v. Reyes CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RANDY RUBEN REYES,<br><br>    Defendant and Appellant. | H039587<br>(Santa Cruz County<br>Super. Ct. No. F23567) |

Defendant Randy Ruben Reyes appeals from a judgment of conviction entered after a jury found him guilty of battery with serious bodily injury (Pen. Code, § 243, subd. (d)).[1]  In a bifurcated proceeding, defendant admitted that he had suffered one prior serious felony conviction (§ 667, subd. (a)(1)) and that he had served three prior prison terms (§ 667.5, subd. (b)).  The trial court sentenced defendant to 12 years in state prison.  On appeal, defendant contends:  the trial court abused its discretion in excluding some of his answers to questions as nonresponsive; and he is entitled to additional presentence custody credits.  We modify the judgment to award defendant 397 days of presentence custody credit.  As modified, the judgment is affirmed.

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.

# I. Statement of Facts

## A. Prosecution Case

On October 14, 2012, two calls were made to 911 regarding an altercation at Taco Bell in downtown Santa Cruz. The first call came in at about 11:08 p.m. while the second came in at 11:12 p.m. The first call was made by one of the employees at Taco Bell. He reported that a man had been injured, was lying on the ground in the patio, and needed medical attention. He identified the victim as Norman Hughes. He described the assailant as a Caucasian male with a black hoodie and a black backpack. He also stated that the assailant was walking on Pacific Avenue towards the Metro station. The caller did not witness the incident.

Officer Abraham Rodriguez was dispatched to Taco Bell around 11:00 p.m. He observed a man lying on the sidewalk at the entrance to Taco Bell. As Officer Rodriguez approached the scene, he recognized the man as Hughes. Hughes's right eye was bleeding, and a woman was holding napkins to his face. Hughes's backpack or bedroll and a cane were next to him. Medical personnel arrived at the scene about a minute later.

Officer Rodriguez obtained statements from various witnesses, including Richard Stipe. Stipe, who was seated in the corner of the patio at Taco Bell, saw Hughes enter the patio with food and sit down across from Stipe. Hughes then engaged in conversation with defendant. Stipe was not paying attention to what they were saying until defendant became belligerent and started yelling at Hughes. Defendant was talking to Hughes about his hygiene, how they were both veterans, and Hughes was giving veterans a bad name because he was not taking care of his hygiene. Hughes responded that at least he was not a heroin addict. Defendant continued yelling, but Hughes did not respond. Defendant left momentarily. When he returned, he walked up to Hughes and struck him in the face with a closed fist. Stipe heard a "very distinctive whack," and Hughes fell to the ground. Defendant then walked on Pacific Avenue towards the Metro Center.

2

Stipe told the officer that he would not participate in an infield-lineup, because he did not want to be referred to as a "rat" or "tattletale." Stipe also stated that he feared retaliation by defendant. Stipe did not mention to Officer Rodriguez that Hughes had a stick or cane in his hand.

Stipe testified at trial, but he did not appear voluntarily. Stipe went to the Taco Bell on the night of October 14, 2012. He saw defendant and Hughes talking and thought that they were joking around. He did not remember when the mood changed in their conversation and his eyes were closed "for a long time." He did not remember telling a police officer that defendant became belligerent and loud or yelled at Hughes for not caring about his hygiene. Stipe stated that defendant was caring for Hughes. He did not remember Hughes telling defendant that at least he was not a heroin addict or that Hughes got up to leave, and defendant came up and struck him with a closed fist. Stipe did not know if he had told the police officer that one of the men was holding a stick. Stipe remembered that Hughes had his cane in his hand and shook both his arms back and forth in an upward motion. He did not think that Hughes was using the cane in "a threatening manner" based on his facial expression. Stipe was not wearing his glasses that evening, so he was not able to see Hughes's facial expression.

James Colbert, the manager at Taco Bell on Pacific Avenue, testified that there are eight surveillance cameras at this location. The camera on the patio captured some of the outdoor tables, but did not have a view of the other tables.

Detective Daniel Forbus testified that he assisted in the investigation of the incident involving defendant and Hughes. He obtained a copy of the surveillance video for the night of October 14 from Colbert. The video showed Hughes on the patio at about 9:12 p.m. Defendant entered the patio at about 10:41 p.m. Defendant was wearing a black sweatshirt and a hat with a "Charlotte Hornets" logo on it. Defendant walked out of camera range at 10:58 p.m. and Hughes followed him. Hughes was standing in the entryway and gesturing. It was unclear whether he had something in his hand. At about

3

11:00 p.m., defendant entered the screen again. About a minute later, Hughes got up and walked out of camera range and exited the patio. At 11:02 p.m., the video showed defendant punch Hughes in the face. Hughes fell to the ground.

Ezra Cerio, a security guard with First Alarm Security and Patrol, testified that he was working at the Metro Center on the night of October 14, 2012, when he heard a call over the police scanner about an assault at Taco Bell. An individual had followed defendant from Taco Bell and drew Cerio's attention to him. When Cerio approached the man, he appeared "agitated" and "upset, possibly angry," and told Cerio that he "didn't do anything." Cerio called the police department. As Cerio was talking to dispatch, defendant got up and walked quickly towards Front Street, and then jogged towards the corner of Front and Cathcart.

Officer Sergio Venegas testified that he detained defendant at Cathcart and Front. Defendant was holding a black hooded sweatshirt, a hat, and a bedroll. Defendant was "agitated, sweating, [and] ranting." Officer Venegas did not observe any injuries to defendant. Another officer collected a black sweatshirt and a blue and black "Charlotte Hornets" baseball cap from defendant.

Dr. David Christopher Danish, an emergency room physician at Dominican Hospital, testified that Hughes's blood-alcohol level was 0.346 when he arrived at the hospital. Hughes had significant bruising around his right eye and abrasions on his forehead and right cheek. He was diagnosed with pro-ophthalmos, which occurs as a result of swelling and blood behind the eye. This condition can cause damage to the optic nerve and blindness if left untreated. Hughes also had a bone fracture below his eye. Hughes was transferred to Stanford Hospital because the hospital was not equipped to care for his injuries. Detectives were initially unable to interview Hughes because he was undergoing medical procedures. They were later unable to locate him.

4

## B. Defense Case

Defendant testified in his own behalf. Defendant was 55 years old at the time of trial and had been honorably discharged from the Marine Corps Reserves. He had been homeless "on and off" for about 10 years. Defendant had prior felony convictions: resisting or obstructing an executive officer in 2011; vandalism in 2008; assault likely to produce great bodily injury in 2002; and assault with force likely to produce great bodily injury in 1993.

On October 14, 2012, defendant spent the day at the beach with other people, including Tina Anderson. At some point during the day, he discovered that his clothes and shoes had been stolen. At around 5:00 p.m., he walked to a friend's house and was given a pair of jeans, socks, and a white shirt. Defendant returned to the beach at around 6:00 p.m. and was given a pair of tennis shoes.

After defendant left the beach, he went to Taco Bell. When he arrived, Hughes was sitting at a table in the corner of the patio. Defendant had known Hughes for two years and considered him an acquaintance. He had never had any problems with him prior to the incident on October 14, 2012.

Defendant spoke with Anderson and Hughes. It was initially a "normal interaction." Hughes appeared to be intoxicated. Defendant told Hughes that his own clothes had been stolen and that "that was actually an incentive for [defendant] to come up on something better than [he] had that was stolen." Defendant said "something about, you know, an incentive for [Hughes] because he had been wearing the same thing for thirty days and maybe he needed an incentive." Hughes became upset with defendant for mentioning that he had been wearing the same clothes for thirty days, stood up, and told him to leave. Hughes also told defendant that he was going to regret what he had said. Hughes stood in one place, but his fists were clenched and he had an "angry look." This interaction was not visible on the surveillance video.

5

When defendant left the patio, Hughes followed him.  They talked on the sidewalk outside the gate.  Hughes was "ranting and raving."  Hughes brought his fist back and he had something in his hand, but defendant was not sure what it was.  Hughes told defendant that he was a killer, defendant had to leave, and he was not going to tell him again.  Defendant was feeling "unsafe, fearful, trying not to underestimate anybody."

Defendant and Hughes returned to the patio.  Hughes then "stood up from where he was sitting, held his cane up over his head in a gesture to clobber [defendant] with it."[2]  This threat was not captured by the surveillance video.  Defendant made "a public announcement" to Anderson and others on the patio that Hughes was being aggressive and threatening him with violence.

Defendant walked out the front entrance of Taco Bell.  When Hughes approached him and raised his arm, defendant believed that he was "launching an attack."  Defendant was feeling "fearful" and he punched Hughes in the face. Defendant did not try to hit Hughes hard.  As defendant left, his "first thought" was "[j]ust to get away from" Hughes.

Defendant walked toward the Metro Center and tried to use the restroom.  However, it was closed.  Since defendant was warm, he removed his sweatshirt.  He then ran from the Metro Center to find a restroom and was arrested a few blocks away.

## II. Discussion

### A.  Admissibility of Evidence

Defendant contends that the trial court abused its discretion when it erroneously excluded portions of his testimony regarding his self-defense claim on the ground that his answers were not responsive to the questions.

---

[2]     However, defendant later testified that he was not sure if Hughes shook his cane before or after they returned to the patio.

6

"'A person claiming self-defense is required to "prove his own frame of mind," and in so doing is "entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear." [Citation.]'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065, quoting *People v. Davis* (1965) 63 Cal.2d 648, 656.) However, "[a] witness must give responsive answers to questions, and answers that are not responsive shall be stricken on motion of any party." (Evid. Code, § 766.) When an answer is responsive in part, the trial court does not abuse its discretion by denying a motion to strike unless the motion was restricted to only that portion of the answer which was nonresponsive. (*Bates v. Newman* (1953) 121 Cal.App.2d 800, 804.) "We review for an abuse of discretion a trial court's exclusion of evidence." (*People v. Brady* (2010) 50 Cal.4th 547, 558.)

We first consider defendant's reliance on *Kramm v. Stockton Electric R. R. Co.* (1913) 22 Cal.App. 737 (*Kramm*) for the proposition that "an answer may be responsive to a question if it is relevant to the *purpose* of the question, if not the form of the question." In *Kramm*, a witness responded to the question, "'Describe the appearance of the car as you saw it when you turned,'" by testifying that "'the car was carrying a current of wind right ahead of her.'" (*Kramm*, at p. 754.) The trial court refused to strike the statement as nonresponsive. (*Ibid.*) *Kramm* concluded: "The statement was partly descriptive of the car in action, and the ruling was proper. Indeed, the question must have had sole reference to the rate of speed at which the car was moving, as its appearance otherwise, before reaching the deceased, could have had no significant bearing upon the main issue in the case." (*Ibid.*) We agree with *Kramm* that the witness's answer was responsive to the question, because it described the car's appearance in action, and thus the trial court properly refused to strike the testimony as nonresponsive. However, *Kramm* then considered the relevancy of the testimony and concluded that it referred to the car's rate of speed. We do not read *Kramm* as holding that a nonresponsive answer is admissible if it is relevant to an issue in the case.

7

We now consider defendant's contentions relating to the trial court's rulings on the admissibility of evidence. Defendant first focuses on his testimony relating to Hughes's intoxication. Defense counsel asked defendant: "Did Mr. Hughes appear intoxicated to you?" The prosecutor objected to the question as leading, but the trial court overruled the objection. Defendant then answered: "I would have to say obviously. You know, he's a chronic alcoholic." The trial court struck defendant's response and stated: "You will not consider that information in any way. Mr. Reyes, please answer the questions that you are asked, and please refrain from volunteering information that you're not asked about, sir." The trial court then asked defendant whether Hughes appeared to be intoxicated, and defendant responded that he did. Defendant's testimony that Hughes was a chronic alcoholic did not describe his condition on the night of October 14, 2012. Instead, defendant described his condition at other times, and thus this testimony was not responsive to the question. The trial court did not abuse its discretion in excluding this portion of defendant's testimony.[3]

Defendant also challenges the exclusion of some of his testimony regarding Hughes's use of a cane on previous occasions. During direct examination, defendant testified that he had felt "threatened" and "unsafe" because Hughes "winded up, bringing his fist back. You can see how he brings his fist back like that. He had something in his hand. I wasn't sure what it was. And he told me that he was a killer and that he was going to beat me to death and that I had to leave and he wasn't going to tell me again." During cross-examination, the prosecutor asked defendant: "[Going back to get your stuff] wasn't that big of an issue because you knew that Norman Hughes wasn't really a killer; isn't that correct?" Defendant replied: "I don't know what he is. I don't know

---

[3]     Defendant's claim that evidence of Hughes's intoxication was excluded at trial is incorrect. Defendant testified several times that Hughes was intoxicated that night, and Hughes's treating physician testified that his blood-alcohol level was 0.346 when he was admitted to the hospital, thereby corroborating defendant's testimony.

him that well. He's an acquaintance. I don't know. I know he's got -- I know I'm not the first person he's raised his cane up to in an attempt to strike. I know that." The trial court granted the prosecutor's motion to strike this testimony. The prosecutor then asked defendant: "You knew that Mr. Hughes wasn't really a killer; yes or no?" Defendant replied: "I don't know that." Since the prosecutor's first question merely called for a "yes" or "no" answer, the trial court properly struck that portion of defendant's testimony regarding Hughes's prior acts.

Defendant next challenges the exclusion of evidence that he believed Hughes was carrying a knife when the attack occurred. On direct examination, defendant testified that Hughes had something in his hand, but he was not "sure what it was." During cross-examination, there was the following exchange: "Q. And during the conversation you mentioned you thought he had something in his hand; is that right? [¶] A. He did have something in his hand. [¶] Q. But you testified earlier you don't know what it is? [¶] A. Right. I did not know what it was, but I know he had something in his hand. [¶] Q. Did it appear to you to be something hard? Something soft? [¶] A. There was a lot going on at the time and I was looking at his eyes more than anything else. [¶] Q. Did it appear to be like a piece of fabric? Did it appear to be something harder? What's your best estimate? [¶] A. Well, I don't want to, you know, assume or speculate, but I've known him to carry a lock-blade knife. It could have been --" The trial court granted the prosecutor's motion to strike. Defendant's response was nonresponsive to "his best estimate" of what Hughes was carrying in his hand based on his observations that night. The prosecutor did not ask defendant what he may have known Hughes to carry in the past. Thus, the trial court did not abuse its discretion in striking this testimony as nonresponsive.

Defendant next focuses on a similar exchange. "Q. And when you hit Mr. Hughes, he didn't have anything in his hand, did he? [¶] A. He had something in his hand. Yes, he did. [¶] Q. He didn't have his cane in his hand? [¶] A. No. His cane

9

was on the ledge where he had access to it when he was out there on the sidewalk. He sat it right on the ledge and when we walked out there he had access to it. [¶] Q. So you knew he didn't have his cane in his hand? [¶] A. Right. But I also know he had a lock-blade knife that he uses." The prosecutor's motion to strike was granted. The prosecutor's question merely called for a "yes" or "no" answer as to whether defendant knew Hughes had a cane in his hand that night. Thus, the trial court properly struck defendant's testimony that he knew Hughes had a knife at some point as nonresponsive.

Defendant also argues that the trial court erred in excluding testimony relating to posttraumatic stress syndrome. While showing the surveillance videotape, the prosecutor questioned defendant about what he was yelling to Anderson before he went to retrieve his bedroll. The following exchange then occurred: "Q. You would agree you just picked up the cup we talked about earlier that Ms. Anderson gave you? [¶] A. Yes. [¶] Q. And you haven't yet gone to retrieve your bedroll? [¶] A. No, I haven't. [¶] Q. You haven't proceeded to leave? [¶] A. Okay. Right. [¶] And that's because you did not -- you were not in fear for your safety at this point, were you? [¶] A. Sure I was. I have an abnormal fear for my safety because of the PTSD I have." The prosecutor's motion to strike was granted on the ground that it was nonresponsive. Defendant's testimony, "Sure I was," was responsive to the question, though his explanation that his fear was abnormal due to posttraumatic stress disorder was not. Thus, the trial court would not have abused its discretion if it had denied the motion to strike since a portion of the testimony was admissible. However, any error in the present case was not prejudicial, because defendant had previously testified several times that he feared for his safety.

Defendant next contends that the trial court erred in excluding the following portion of his testimony. "Q. And when you moved [and hit Hughes in the face] you used the weight from your back leg; is that correct? [¶] A. I have hardware in my right knee so sometimes I have to maneuver a certain way because it's very painful. There's

10

no cartilage in my right knee. I have a big old scar in my leg, hardware, all kinds of plates." The trial court granted the prosecutor's motion to strike defendant's response. Once again, since the prosecutor's question merely called for a "yes" or "no" answer regarding how defendant used his leg. Thus, the trial court properly struck his testimony relating to the condition of his knee.

In sum, we reject defendant's contention that the trial court improperly excluded several of his answers as nonresponsive.

### B. Custody Credits

Defendant contends, and the Attorney General concedes, that he is entitled to additional presentence custody credits.

Section 4019, subdivision (f) provides: "It is the intent of the Legislature that if all days are earned under this section, a term of four days will be deemed to have been served for every two days spent in actual custody." However, section 2933.1 limits the ability of a defendant who has been convicted of certain felonies to earn credits as provided for in section 4019. Section 2933.1, subdivision (a) provides: "Notwithstanding any other law, any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit, as defined in Section 2933."

Section 667.5, subdivision (c)(8) provides: "For the purpose of this section, 'violent felony' shall mean any of the following: [¶] . . . [¶] (8) Any felony in which the defendant inflicts great bodily injury on any person other than an accomplice which has been charged and proved as provided for in Section 12022.7, 12022.8, or 12022.9 on or after July 1, 1977, or as specified prior to July 1, 1977, in Sections 213, 264, and 461, or any felony in which the defendant uses a firearm which use has been charged and proved as provided in subdivision (a) of Section 12022.3 or Section 12022.5 or 12022.55."

11

Here, defendant was convicted of battery with serious bodily injury (§ 243, subd. (d)).  However, his conviction was not a felony as defined by section 667.5, subdivision (c)(8), because it was not charged and proved as provided for in sections 12022.7, 12022.8, or 12022.9.  Thus, the applicable sentencing scheme is set forth in section 4019.  Since defendant served 199 actual days in jail, the trial court erred by failing to award him 198 days of conduct credit for a total of 397 presentence custody credits.

### III.    Disposition

The judgment is modified to award defendant 397 days of presentence custody credit.  As modified, the judgment is affirmed.  The trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

_____
Mihara, J.

WE CONCUR:


_____
Premo, Acting P. J.



_____
Elia, J.