[Crim. No. 6130. In Bank. May 27, 1958.]

THE PEOPLE, Respondent, v. EDWARD SIMON WEIN, Appellant.

Russell E. Parsons and Henry E. Kappler for Appellant.

Louis Licht as Amicus Curiae on behalf of Appellant.

Edmund G. Brown, Attorney General, Elizabeth Miller, Ray R. Goldie and Joe Yasaki, Deputy Attorneys General, for Respondent.

SPENCE J.—Defendant was charged by information with three counts of robbery (Pen. Code, § 211), six counts of rape (Pen. Code, § 261, subd. 3), six counts of sex perversion (Pen. Code, § 288a), two counts of kidnaping (Pen. Code, § 207), and five counts of kidnaping for the purpose of robbery (Pen. Code, § 209). Defendant initially entered pleas of not guilty and not guilty by reason of insanity, but he withdrew the latter plea prior to trial. The jury found defendant guilty on all the counts charged in the information. They further found that in each count charging kidnaping for the purpose of robbery, the person named therein suffered bodily harm, and they fixed the penalty at death; and that in each count charging robbery, the crime was in the first degree. A motion for a new trial was denied. Defendant was sentenced to death on the five counts of kidnaping for the purpose of robbery done with bodily harm, and to the state prison for the term prescribed by law on each of the remaining counts, the last mentioned sentences to run consecutively. This appeal from the judgments of death comes before us automatically. (Pen. Code, § 1239, subd. (b).) Defendant's present counsel have been substituted for his trial counsel for the purpose of this appeal.

These convictions arose out of separate attacks on eight different women, which attacks occurred over a period of approximately 18 months. It would serve no useful purpose to relate all the sordid facts surrounding the commission of the several offenses. The evidence concerning the last incident will be set forth in some detail, as it typifies the general pattern which ran through most of the attacks with but slight variations.

On October 30, 1956, the last victim advertised some furniture for sale in several newspapers circulated in the Los Angeles vicinity, giving her telephone number but not her address. She occupied a lower apartment in a house located in the Hollywood hills. At about noon on October 31, 1956, she received a telephone call from a man in response to the advertisement, and she made an appointment for him to see the furniture that afternoon. The man arrived at about 2:30 p. m. and identified himself as the party who had called earlier that day. A friend of the victim was present at her apartment when he arrived. He indicated that he was interested in beds and accompanied the victim into the bedroom to examine them. After seeing and discussing the furniture for 10 to 15 minutes, the man left, saying that he would either call or return after visiting another place. The victim drove her friend home at about 3:30 p. m. and returned to her apartment at about 3:45 p. m.

About five minutes after her return, the man reappeared at the apartment and said that he wanted to measure one. of the beds to see if it would fit his living quarters. After measuring the bed, he stated that he would like to call his wife and have her view the furniture. With the victim's permission, he used her telephone, and after dialing a number and apparently getting no response, he hung up.

The man then looked at his watch and told the victim that he had lost his watch stem. She sympathized with him and got down on the floor in the small hall just outside the living room to help him look for it. Being unable to find the stem, she started to get up. The man, who was then behind her, put his arm around her waist and told her to say nothing. She felt something sharp in her back and discovered that it was a knife. He instructed her to lie down and then tied her hands with copper wire.

He then told the victim to find her billfold, and after helping her up, told her that he wanted only money and that he would not hurt her. She could not remember exactly where she had last placed her billfold. With his arms around her and the knife in her back, he forced her against her will and without consent to walk with him to a desk in the living room. This was a distance of approximately 20 to 25 feet. He opened the desk drawer but the billfold was not there. He told the victim to crawl on her knees through the living room to the bedroom, a distance of about 50 feet, and she complied out of fear. She told him to look in the dresser drawers. He found

the billfold, and placed it and the $17 or $18 it contained in his pocket.

The man then pushed the victim to the floor and said, "Now I have got the money, how about some sex?" He then removed the clothing from the lower portions of her body, exposed his private parts, and forced her to engage in an act of oral copulation (Pen. Code, § 288a) while he brandished a knife. Thereafter, and without her consent, he indulged in an act of sexual intercourse.

The telephone then rang and the occupants of the upstairs apartment started to walk around. The man said that he was going to leave. He made the victim lie on the floor on her stomach, tied her legs with her hose, and shoved her undergarments into her mouth. He then picked up a towel and ripped it, using the larger portion to wipe the floor, drawers and door knobs. He tied the other part of the towel around her mouth and covered her head with another towel. After he had left, she struggled and was able to free her hands and feet. She then summoned the police.

The seven other incidents reflect in varying degrees the same techniques and show a consistent pattern of operations used by the perpetrator of these crimes. In each case, either rentals of living quarters or sales of personal property had been advertised in the newspapers. In all but one, he gained entrance on the pretext that he was answering the advertisement. He would often use some ruse to survey the premises for other occupants, such as asking to wash his hands in the bathroom, viewing the items for sale, or making a telephone call. In several instances, he left after finding some impediment to his scheme, later returning at a more opportune time. In some, he pretended to call his wife or girl friend to have her join in the selection. He feigned that he had dropped a watch stem in six cases and a watch crystal in another. He grabbed the victims from behind and threatened them with a knife. Their hands were tied with copper wire in several cases, and their legs were bound with their own stockings. In many ways, the methods that he employed in forcing the victims to part with their money and, in most instances, to submit to his lustful desires were strikingly similar. Of course, all the similarities did not appear in every case. The sexual molestations varied in degree and did not occur at all in one case. During one attack, the assailant and another man were present. Nevertheless, there can be little doubt that the same man committed all of the numerous crimes charged.

Defendant was connected with these offenses in several ways. Seven of the victims positively identified him as their assailant. The eighth said he looked like the same man. Beyond these identifications, there were four other phases of the evidence corroborating the victims. First, a man transacting business with one of the victims clearly identified defendant as the person who was with her the night before she was molested. Second, a car which defendant had borrowed from a friend was seen parked in the driveway of the residence of one of the victims by two witnesses who recognized the vehicle by the lettered part of the California license plate and the somewhat unique brand of tires on it. Third, defendant was identified as the man who answered an advertisement for the sale of a used kitchen range and who left a check in payment. A handwriting expert testified that defendant was the person who wrote the check. There was no attack involved in the last mentioned incident. Fourth, expert witnesses testified that a fragmentary fingerprint found on a water glass, used by the assailant at the home of one of the victims, was the fingerprint of defendant.

Defendant denied that he had committed any of the offenses. Witnesses were called to testify to his good reputation. He also presented testimony indicating that he was at other locations during the time that three of the offenses had been committed.

### Conduct of Prosecuting Attorney During Voir Dire Examination

■ Defendant contends that the deputy district attorney was overly zealous in questioning the prospective jurors. He primarily objects to the examination of the jurors about their opinions on capital punishment and to the discussion of their responsibility for imposing the death penalty if warranted by the facts of the case. However, a prosecutor in a case where the death penalty may be imposed clearly has the right to ascertain the views of the potential jurors (see *People* v. *Hoyt*, 20 Cal.2d 306, 318 [125 P.2d 29] ; *People* v. *Rollins*, 179 Cal. 793, 795-796 [179 P. 209]) so that he can intelligently exercise his challenges against those whose consciences would preclude them from imposing this penalty. (See Pen. Code, § 1074, subd. 8; *People* v. *Riser*, 47 Cal.2d 566, 573-576 [305 P.2d 1].)

■ Defendant also deems portions of the prosecutor's explanation of the law applicable to the case to have been preju-

dicial. However, the prosecutor properly used such explanation as a basis for hypothetical questions to determine whether the jurors would follow the instructions of the court (*Kramm v. Stockton Electric R.R. Co.*, 22 Cal.App. 737, 746-747 [136 P. 523]) and to ascertain their state of mind on the issues to be presented. (*People* v. *Knight*, 44 Cal.App.2d 887, 891-893 [113 P.2d 226].)

 Defendant challenges the prosecutor's remarks, to the effect that he represented all of the people of this state and not just the victims or police, as being calculated to impress the jurors with the importance of his position and to cause them to give undue weight to his actions. However, it was entirely proper for this public officer to inform the panel of his functions. In effect, he did little more than to state general theories underlying criminal prosecutions. In any event, since defendant failed to object to any of the alleged improper conduct during the deputy district attorney's examination of the veniremen, he cannot now complain for the first time as, upon objection, any danger that the jury might have misunderstood their duty could have been corrected by proper instructions. (*People* v. *Brice*, 49 Cal.2d 434, 437 [317 P.2d 961]; *People* v. *Guasti*, 110 Cal.App.2d 456, 465 [243 P.2d 59].)

### Conduct of Prosecuting Attorney During Arguments

Defendant raises numerous objections to the deputy district attorney's arguments to the jury and states that the alleged misconduct denied him a fair trial as guaranteed by both the state and federal Constitutions. He claims that the jurors were "whipped" into their recommendation of the death penalty. This, in his view, was apparently produced by the prosecutor calling the jurors by their names, by taking them to task, and by using epithets. However, his conclusions entirely overstate the actual situation. It is true (1) that the deputy district attorney did refer to one or more jurors by name on three separate occasions; (2) that he did vigorously urge the jury throughout his arguments to impose the death penalty; and (3) that he did use "epithets" when he referred to defendant as being among that "strange breed" of "kidnapers, robbers and forcible rapists." With respect to the first point, while arguments should be addressed to the jury as a body and the practice of addressing individual jurors by name during the argument should be condemned rather than approved, it does not follow that such conduct

is necessarily prejudicial in any given case. ▮ With respect to the second point, while the accused is entitled to a fair trial, the prosecutor may properly urge his points vigorously as long as he does not act unfairly; and therefore he may vigorously urge the jury to convict and to impose the death penalty in the light of the evidence. (*People* v. *Harris*, 219 Cal. 727, 732-733 [28 P.2d 906].) ▮ And with respect to the third point, the prosecutor may use appropriate epithets which are warranted by the evidence without being chargeable with prejudicial misconduct. (*People* v. *Carr*, 113 Cal.App.2d 783, 788 [248 P.2d 977]; *People* v. *Hunter*, 49 Cal.App.2d 243, 250-251 [121 P.2d 529]; *People* v. *Burnette*, 39 Cal.App.2d 215, 230 [102 P.2d 799].) ▮ In any event, no objection was made in the trial court to any of the above conduct or to certain other matters of which defendant now complains, and no instructions were asked with respect thereto. We have consistently rejected such claims when the point is raised for the first time on appeal. (*People* v. *Hampton*, 47 Cal.2d 239, 240-241 [302 P.2d 300]; *People* v. *Byrd*, 42 Cal. 2d 200, 208 [266 P.2d 505].) ▮ Furthermore, this is not a case where any possible harmful effect of the comments could not have been obviated by a timely admonition to the jury (see *People* v. *Kirkes*, 39 Cal.2d 719, 726-727 [249 P.2d 1]) or where the evidence was so closely balanced, presenting grave doubt as to defendant's guilt, that the prosecutor's argument materially affected the outcome. (*People* v. *Fleming*, 166 Cal. 357, 381 [136 P. 291, Ann.Cas. 1915B 881].)

▮ There was one instance during the prosecutor's argument, however, where he may have strayed beyond the bounds of permissible argument and where a prompt objection was made by defendant's counsel. The prosecutor said, in part, "Why, this fellow puts Caryl Chessman to shame. He makes a rank amateur out of Caryl Chessman." At this point, the defense counsel cited this as prejudicial misconduct and requested that the jury be instructed to disregard it. The prosecutor then asserted his right under *People* v. *Kynette*, 15 Cal.2d 731 [104 P.2d 794], to proceed along these lines and the court permitted him to do so. He then contrasted Chessman's attacks from an automobile disguised as a police vehicle operating in the relative open of the public streets with defendant's assaults in the victims' homes. He then said, "Chessman, too, had ice water in his veins. That little girl [the 14-year-old victim in this case] . . . will carry a mark on her forever. She may end up the same way Mary Alice

Meza, the 17-year-old virgin, the victim of the Chessman attack, in a mental institution unless she has a strong mind and can in some way through her religious thinking beat it." He then concluded that the death penalty was deserved because the defendant displayed the ". . . behavior pattern of a cold cruel individual with ice water in his veins."

The People attempt to justify the quoted argument, as did the prosecutor at the trial, by referring to *People* v. *Kynette*, *supra*. There it was said: "Counsel may illuminate his argument by illustrations which may be as various as the resources of his talents. He may refer to matters of common knowledge, not special to the case, and to well known historical incidents." (15 Cal.2d 731, 757.) It appears, however, that the comments here were more similar to those criticized in *People* v. *Jackson*, 44 Cal.2d 511 [282 P.2d 898]. There the prosecutor in a kidnaping case referred to the Greenlease, Hart, and Lindbergh cases, and compared the ultimate fate of the victims. (44 Cal.2d 511, 520.) But even assuming that the prosecutor here went beyond the bounds of legitimate argument in his comparison of this case with the Chessman case, it does not follow that a reversal is required. It was not claimed on the trial or on this appeal that the perpetrator of the several offenses should have had imposed upon him any punishment less than that which the jury imposed. Defendant's sole claim was that he was not the perpetrator. We have reviewed the record, and such review convinces us that the evidence of defendant's guilt was so strong that there is no reasonable probability that any result more favorable to defendant would have been reached in the absence of the claimed misconduct. Under such circumstances, the claimed misconduct does not constitute ground for a reversal. (*People* v. *Watson*, 46 Cal.2d 818, 837-838 [299 P.2d 243].)

*Argument of Prosecuting Attorney as to Meaning of Life Imprisonment without Possibility of Parole and Legislative Abolition of Death Penalty*

Defendant asserts that it was prejudicial error for the deputy district attorney to have stated both in his *voir dire* examination of the jury and his closing argument that a sentence of life imprisonment without possibility of parole would not necessarily mean that defendant would remain in prison for the remainder of his life. He pointed out that any such sentence could be commuted by the Governor, that a pardon could be granted by the Governor, or that the Legisla-

ture might enact a law changing the sentence. In *People* v. *Chessman*, 38 Cal.2d 166, 189-190 [238 P.2d 1001], the identical remarks, both in the argument by the prosecutor and the explanatory instructions by the court, were sanctioned insofar as they were addressed to the discretion of the jury in specifying the punishment for kidnaping for the purpose of robbery where the victim suffered bodily harm. (See also *People* v. *Reese*, 47 Cal.2d 112, 116-117 [301 P.2d 582]; *People* v. *Jensen*, 43 Cal.2d 572, 580-581 [275 P.2d 25]; *People* v. *Byrd*, *supra*, 42 Cal.2d 200, 206-208.) When the deputy district attorney's remarks are read in full, it is quite apparent that they could only have been taken by the jurors as factors to be considered in assessing the penalty. The case of *People* v. *Morlock*, 46 Cal.2d 141, 147-148 [292 P.2d 897], relied upon by defendant, is clearly distinguishable. There, the prosecutor erroneously stated that a person sentenced to life imprisonment was eligible for parole *within* seven years rather than after having served seven years. Equally unavailing is *People* v. *Caetano*, 29 Cal.2d 616, 619-620 [177 P.2d 1], since the only comments there held improper were to the effect that paroles might be granted without regard to merit in order to provide space for incoming prisoners.

 Defendant also maintains that the deputy district attorney's reference to the Legislature's consideration of a bill proposing a moratorium on the death penalty may have harmed him by leading the jurors to believe that he would benefit from such a suspension. However, the deputy district attorney made it abundantly clear that he did not believe that any such moratorium would be adopted. He merely used this to show how changes in penalties could be sought in amplication of his remarks on the uncertainties of a sentence to life imprisonment without parole.

### Sufficiency of Evidence

 Defendant argues that there was ample evidence to have supported a verdict of acquittal, and he buttresses this conclusion by marshaling those facts which tend to show his innocence. He then characterizes parts of the People's expert testimony as "highly suspect." From this, he expresses the belief that the jury might well have accepted his alibi except for the "grossly prejudicial" conduct of the prosecutor. Insofar as this again raises the question of prejudice from the prosecutor's actions, this has been fully considered. Insofar as it challenges the sufficiency of the evidence, defendant is merely asking us to reweigh the evidence. This is clearly not

our function as an appellate court. (See *People* v. *Daugherty*, 40 Cal.2d 876, 885 [256 P.2d 911]; *People* v. *Headlee*, 18 Cal. 2d 266, 267 [115 P.2d 427]; *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Tedesco*, 1 Cal.2d 211, 219 [34 P.2d 467].) Further, even though there might have been sufficient evidence to sustain a finding of not guilty, this in no way shows that the verdict of guilty was without abundant evidentiary support.

Finally, defendant attempts to show that some of the evidence was so highly improbable as to be incredible and to thus allow an appellate court to set aside the conviction. (See *People* v. *Headlee, supra*, 18 Cal.2d 266.) He says that, as a small man with an injured back, he would have been unable to seize a woman, tie her, and then rape her. The jury only had defendant's own testimony as to the condition of his back, but they did have a full view of his stature and the relative stature of the victims. It was within their province to reject his statements, as they apparently chose to do. They evidently believed the testimony of the various women whom he had abused. The conflict in the evidence was resolved by the triers of fact. There is nothing in the record to establish that it was physically impossible for defendant to have performed the acts ascribed to him, or to compel us to declare that the numerous victims' testimony was inherently improbable. (*People* v. *Huston*, 21 Cal.2d 690, 693 [134 P.2d 758]; *People* v. *Wilder*, 151 Cal.App.2d 698, 704-705 [312 P.2d 425].)

### Extent of Movement Required to Establish Kidnaping Under Penal Code, Section 209

Defendant urges that the Legislature in enacting section 209 of the Penal Code, which permits the imposition of the death penalty against "any person . . . who kidnaps or carries away any individual to commit robbery" if the victim suffers bodily harm, intended that the movement be over a substantial distance and not merely between the rooms in a dwelling. He expressly asks this court to reconsider the position it took in *People* v. *Chessman, supra*, 38 Cal.2d 166, 190-193. There we said, "The fact that Regina in being kidnaped or carried away was forced to move only 22 feet does not make her abduction any the less kidnaping within the meaning of the statute. She was taken from the car of her chosen escort, and from his company, to the car of defendant and into the latter's company and there detained as a virtual prisoner and forced to submit to his demands. It is the

fact, not the distance, of forcible removal which constitutes kidnaping in this state." (38 Cal.2d 166, 192.) We there reviewed the California cases and those from other jurisdictions where kidnapings were held to exist although the asportations were not great. Here, the testimony of some of the victims fixed the amounts of movement at distances ranging from a few feet up to more than 50 feet. Under the reasoning and language of the Chessman case, any of these distances sufficed for a conviction under the challenged section. This conduct went beyond a mere detention during the course of an armed robbery, which is no longer punishable by death. (See *People* v. *Taylor,* 135 Cal.App.2d 201 [286 P.2d 952].) To the extent that defendant's argument is predicated on legislative intent, it must be noted that the Legislature has been in session several times since the Chessman case was decided, and it has not seen fit to amend the kidnaping law to limit the rule we announced. If the section, as interpreted by this court, is regarded as too harsh, the remedy is for the Legislature to redefine kidnaping, and not for this court to engraft some uncertain distance limitation onto the plain language of the section. (See *People* v. *Knowles,* 35 Cal.2d 175, 180-183 [217 P.2d 1].)

### Constitutionality of Penal Code, Section 209

 Defendant asks that we declare section 209 unconstitutional because the language, "who kidnaps or carries away," is uncertain. This indefiniteness is supposed to be apparent from the decisions of this and other California courts. However, defendant fails to cite the decisions which he believes produce this effect. Rather, it would seem that the previously quoted language from the Chessman case clearly indicates the broad sweep of this section.

While defendant concededly had a right to fair notice as to what acts were prohibited (see *In re Peppers,* 189 Cal. 682 [209 P. 896]; *People* v. *Neff,* 117 Cal.App.2d 772, 780-781 [257 P.2d 47]), it appears that the questioned statute contained terms well enough known to enable defendant and others to understand their import. (See *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 59-61 [216 P.2d 859]; *People* v. *Deibert,* 117 Cal.App.2d 410, 417-420 [256 P.2d 355]; *People* v. *Darby,* 114 Cal.App.2d 412, 427-428 [250 P.2d 743].) The statute did not have to include "detailed plans and specifications" of the proscribed conduct. (*Lorenson* v. *Superior Court, supra,* 35 Cal.2d 49, 60.)

*Admissibility of Accusatory Statements*

 Defendant claims that the trial court erred in admitting certain statements and by treating his reactions to them as adoptive admissions. One of the victims testified that after she had seen defendant in a line-up in jail, she was asked by the police to confront him. When she later met him in a small room, she remarked, ''Well, I'm glad they caught you, kid.'' Defendant made no reply. The other incident occurred when a witness, who had seen defendant at the home of one of the victims prior to an attack, later asked defendant several questions at the behest of the investigating police officers. Defendant cast his eyes toward the floor and said that he would not answer any questions unless he had an attorney present. Defendant contends that these incidents could not possibly be construed as any type of admission, and that the error in admitting them was compounded by the deputy district attorney's comments and the court's instructions.

While the testimony concerning the first incident involving the remarks of a victim was correctly admitted in order to permit the jurors to evaluate its accusatory nature and the weight to be accorded to defendant's failure to make any reply (see *People* v. *Smith,* 111 Cal.App. 579, 580-581 [295 P. 862]), the second one, where defendant remained silent on the asserted ground that he would not speak unless he had an attorney present, might well have been excluded if objection had been made. (See *People* v. *Abbott,* 47 Cal.2d 362, 373 [303 P.2d 730] ; *People* v. *McGee,* 31 Cal.2d 229, 238-240 [187 P.2d 706].) However, defendant's objection to this line of testimony is made for the first time on this appeal. Such belated attempts to obtain reversals have been held ineffective in regard to testimony relating to alleged admissions (*People* v. *Guarino,* 132 Cal.App.2d 554, 559 [282 P.2d 538] ; *People* v. *Cummings,* 7 Cal.App.2d 406, 407 [46 P.2d 778]) and in regard to admitting hearsay evidence (*People* v. *Wade,* 138 Cal.App.2d 531, 533 [292 P.2d 303] ; *People* v. *Murray,* 135 Cal.App.2d 600, 602 [287 P.2d 775]). The rule should apply with equal force to testimony relating to alleged adoptive admissions. Also, defendant cannot make, as he attempts here, his first attack on the arguments of the deputy district attorney with regard to admissions on appeal, when any error could have been obviated at the trial. (See *People* v. *Brice, supra,* 49 Cal.2d 434, 437; *People* v. *Hampton, supra,* 47 Cal.2d 239, 240-241 [302 P.2d 300].) More-

over, the giving of instructions on the definition of an admission, the effect of silence or a false or evasive reply, and the possibility of falsehoods indicating consciousness of guilt (see Cal. Jury Instrns., Crim. (1946 and Supp. 1953) Nos. 29, 29-D, 30, 30-A) was not error since the evidence introduced without objection could be considered by the jury. (See *People* v. *Wade, supra,* 138 Cal.App.2d 531, 533; *People* v. *Murray, supra,* 135 Cal.App.2d 600, 603.) ▮ Further, although not raised by the deputy district attorney before the jury, there were other incidents in the record, admitted without objection, which fell within these instructions. When the last victim saw defendant in a public place and had him detained, she said, ''This is the man that raped and kidnaped me.'' Defendant made what might well be considered an equivocal answer to the direct accusation when he replied, ''That gal is drunk.'' ▮ Also, defendant's testimony placing him at another location during one of the attacks was directly contradicted by his own statements made to the investigating police officers shortly after his arrest. The jury could have considered the latter statement as a false or contradictory statement showing consciousness of guilt.

## *Instructions*

Defendant assails certain instructions given to the jury and challenges the trial court's refusal to utilize some of the instructions offered by him. ▮ First, he complains that the standard instruction on consciousness of guilt and falsehood (Cal. Jury Instrns., Crim. (1946) No. 30-A) should not have been read because part of it pertains to situations where a defendant has ''endeavored to procure false or fabricated evidence to be produced at the trial.'' Defendant's witnesses testified that he had spent the day of October 31, 1956, being the date of the last attack, at his sister's home. On the other hand, defendant had been positively identified by the victim in her testimony as the person who committed the offenses in her home on that date. Furthermore, defendant had told the police following his arrest that he had been at specified places, other than his sister's home, on the date in question. The jury could properly infer from this evidence that defendant had, in fact, procured false and fabricated alibi evidence with respect to October 31, 1956. There was therefore no error in giving the challenged instruction.

▮ Second, defendant maintains that while the standard instruction to the effect that neither the prosecution nor de-

fense is required to produce all available evidence (Cal. Jury Instrns., Crim. (1946) No. 23) correctly states the law generally, this case comes within a recognized exception. Defendant relies on *People* v. *Beal*, 116 Cal.App.2d 475, 479 [254 P.2d 100], where the court in a case involving the rape of a 13-year-old girl stated that, since the prosecution failed to produce the examining physician as a witness, it was to be "presumed that his testimony would not be corroborative of that given by the complaining witness." Here, defendant points out that the brothers and sisters of the 14-year-old victim, who were in the house when defendant arrived but were not present when the criminal acts were perpetrated, and the escort of the last victim, who was with her when she encountered defendant in a public place and had him apprehended, were not called to testify. However, the Beal case is readily distinguishable. There, the testimony would have been highly material. The rape victim was examined by a physician the morning after the attack but the physician was not offered as a witness. Here, the witnesses could not have testified to any ultimate issues or essential elements of the crimes charged. Further, the reversal in the Beal case did not turn directly on the failure to call the physician. The court found that certain statements of the prosecuting attorney were highly improper. To show how this misconduct was prejudicial, the court looked to the even balance of the evidence. It was in this context that it stated the presumption. (116 Cal.App.2d 475, 477-479.) ▆ Instead, *People* v. *Tuthill*, 31 Cal.2d 92, 102 [187 P.2d 16], would seem to be controlling. There we said, "There is no compulsion on the prosecution to call any particular witness . . . so long as there is fairly presented to the court the material evidence bearing upon the charge for which the defendant is on trial." (31 Cal.2d 92, 98.) This rule applies to the instant case, and shows that there was no error in giving the challenged instructions, which substantially reiterated the rule announced in the Tuthill case.

▆ Third, defendant contends that by using the standard instruction on contradictory statements with its clause applicable when a defendant is a witness (Cal. Jury Instrns., Crim. (1946 and Supp. 1953) No. 54-A-alternate), the court unduly emphasized any contradictions made by defendant. He says that a general instruction should have been given pertaining to all witnesses, since one of the victims made conflicting statements about her assailant's height. However, defendant

fails to correctly analyze the alternate standard instruction. The first clause is identical to the instruction to be given when the defendant has not contradicted himself. (Cal. Jury Instrns., Crim., *supra*, No. 54-A.) The only difference is in the last sentence of the alternate instruction, which correctly states that a defendant's own contradictory statements can be used beyond impeachment to show the truth of such statements. (See *People* v. *Southack*, 39 Cal.2d 578, 585 [248 P.2d 12].) This alternate instruction covers contradictions by all witnesses and does not place too great emphasis on defendant's own statements. The court properly refused defendant's own more general instruction, since the applicable law had been fully covered. (*People* v. *Steccone*, 36 Cal.2d 234, 240 [223 P.2d 17] ; *People* v. *Eggers*, 30 Cal.2d 676, 688 [185 P.2d 1].)

Fourth, defendant interposes several objections to instructions on what the jurors could consider in fixing the penalties. He attempts to show uncertainty between two paragraphs of one instruction because the second did not repeat the number of the counts of the information in discussing them the second time. However, this could not have created any confusion in the minds of the jurors because the character of the offenses discussed in the second paragraph was clearly mentioned and the various counts had been fully explained in one of the preceding instructions.

Defendant also tries to show a conflict between two portions of the instructions which he believes could have only led to misunderstanding on the part of the jurors. He initially refers to the paragraph telling the jury not to consider the possible penalties on those counts other than kidnaping for the purpose of robbery with bodily harm. He then contrasts a small fragment of another instruction telling the jurors, ". . . it is your duty to conscientiously consider all the evidence in the case in arriving at your decision as to the penalty to be fixed by you in this case." However, defendant has taken the latter quotation out of the context of the instruction given by the court on the penalty for kidnaping for the purpose of robbery where bodily harm has been suffered by the victim. It correctly and clearly placed in the jury's absolute discretion the imposition of either the death penalty or confinement for life without possibility of parole (Pen. Code, § 209) and permitted the jury to take all the evidence into consideration on this inquiry alone. These full instructions could not have confused the jury.

Defendant also asserts that the jury had no right to use all of the evidence in choosing between the two penalties. He says that it had to set the penalty by referring only to the evidence introduced on the particular count. He cites no authority for this proposition. Section 209, in committing this determination to the discretion of the jury, sets no limits. Rather, the language used in the instructions here seems entirely proper in the light of our decision in *People* v. *Brust,* 47 Cal.2d 776 [306 P.2d 480]. In affirming the death penalty for multiple murders, we there held that the jurors had been correctly instructed and that they were to select the penalty on the basis of ". . . a thorough consideration of all the evidence. . . ." (*People* v. *Brust, supra,* p. 789; see also *People* v. *Friend,* 47 Cal.2d 749, 767-768 [306 P.2d 463].)

Also, defendant claims that the following portion of the instruction about the penalty under section 209 was meaningless: "Insofar as selecting the penalty is concerned the law does not itself prescribe, nor authorize the court to innovate any rule circumscribing the exercise of your discretion, but, rather commits the whole matter of its exercise to your judgment and conscience." This portion of the instruction was neither meaningless nor incorrect. (See *People* v. *Friend, supra,* 47 Cal.2d 749, 767.) It was but another way of telling the jurors that they were charged with the final determination of the penalty, and that they were to act within their own uncircumscribed discretion.

Fifth, defendant objects to the instruction covering the manner in which the jury was to proceed in its deliberations on those counts charging kidnaping for the purpose of robbery. He extracts two phrases and says that they were a misstatement of the law. However, the court was correct in telling the jury that they could consider the evidence and the possible consequences of the two penalties in determining the punishment defendant should receive. (See *People* v. *Brust, supra,* 47 Cal.2d 776, 789-790, n. 4; *People* v. *Friend, supra,* 47 Cal.2d 749, 767, 768.) The instruction as a whole presented an accurate summation of the process to be used in fixing the penalty for the violations of section 209.

Sixth, defendant contends that the instructions on the elements necessary to constitute a violation of section 209 were improper. However, the instructions were correctly based upon the statute and the rules enunciated in *People* v. *Chessman, supra,* 38 Cal.2d 166, 192. Also, defendant says

that there was a mere detention involved here, and that the instructions on kidnaping under section 209 were inapplicable. However, there was far more than a mere detention here as hereinabove indicated.

 Seventh, defendant urges that the court erred in failing to give a cautionary instruction to the effect that, in prosecutions for sex offenses, accusations are easily made and difficult to disprove, and that the testimony of the prosecuting witnesses should be carefully examined. Even if such an instruction is not requested, as here, it is incumbent upon the court to give one on its own motion. (*People* v. *Nye,* 38 Cal.2d 34, 40 [237 P.2d 1]; *People* v. *Willis,* 129 Cal.App. 2d 330, 336 [276 P.2d 853].) However, it is not always prejudicial error for the court to fail to give the instruction, since the circumstances of each case are the determinative factor. (*People* v. *Nye, supra,* p. 40; *People* v. *Willis, supra,* p. 337.) Here, seven of the eight prosecuting witnesses testified with a high degree of certainty as to defendant's identification and criminal acts. Their testimony revealed a set pattern in which their assailant operated. To this extent their stories were mutually corroborative. On the whole, their narrations were completely consistent in all important respects. The only possible discrepancy that defendant is able to show was where the 14-year-old victim was uncertain of defendant's height. Further, other substantial evidence connected defendant with the crimes. As was said in *People* v. *Nye, supra,* page 41: "A careful examination of the entire record in accord with article VI, section 4½ of the California Constitution, leads us to the conclusion that it is improbable that the jury would have rejected the testimony of the prosecuting witnesses had a cautionary instruction been given and that there has therefore been no miscarriage of justice requiring reversal of the judgment."

### Admission of Evidence on Rebuttal

 Defendant makes two objections to evidence presented by the prosecution on rebuttal. First, he claims that a woman witness, who was not attacked, should not have been allowed to testify that defendant answered her newspaper advertisement offering an electric range for sale. She identified a check as having been given to her by defendant under an assumed name. Later, a handwriting expert expressed his opinion that the check was written by defendant. This chain of evidence was produced on rebuttal after defendant had denied on cross-examination all the es-

sential facts of the incident. The practice of allowing the district attorney or his aides to withhold a part of their case in chief and to offer it after the defense has closed has been condemned in *People* v. *Carter*, 48 Cal.2d 737, 753-754 [312 P.2d 665], and *People* v. *Rodriquez*, 58 Cal.App.2d 415, 418-419 [136 P.2d 626]. But here the testimony was clearly introduced primarily for purposes of impeachment of defendant in his denial on cross-examination of an incident not charged in the information. In any event, no objection was made to the introduction of this evidence. Further, the order of proof rests largely in the sound discretion of the trial court. (Pen. Code, §§ 1093, subd. 4, 1094; *People* v. *Byrd*, *supra*, 42 Cal.2d 200, 211-212; *People* v. *Avery*, 35 Cal.2d 487, 491 [218 P.2d 527].) Where, as here, the desirability of admitting the testimony at the questioned point may be debatable, no abuse of discretion on the part of the trial court should be found when that court has not had the point brought to its attention. (See *People* v. *Carter*, *supra*, 48 Cal.2d 737, 754.)

 Second, defendant claims that the expert testimony that defendant's fingerprint was found on a glass at the home of one of the victims should not have been received on rebuttal. The prosecution had this information two days prior to the close of its case in chief. Again we come to the question whether the district attorney or his aides indulged in a proscribed withholding of matter properly belonging in their case in chief. (*People* v. *Carter*, *supra*, 48 Cal.2d 737, 753-754; *People* v. *Rodriquez*, *supra*, 58 Cal.App.2d 415, 418-419.) An affirmative answer seems possible. However, under the facts of this case, a reversal is not warranted. To the extent that defendant may have been unfairly surprised, this was obviated by the granting of his request for additional time to meet this testimony. The fingerprint was probably not unduly magnified in significance, since it merely corroborated the direct testimony of one of the victims. It was not as crucial as the defendant's confession withheld in *People* v. *Rodriquez*, *supra*, or the defendant's apparel found near where the murder weapon was abandoned and withheld in *People* v. *Carter*, *supra*, a case resting entirely on circumstantial evidence. In short, it cannot be said that any claimed error in admitting this testimony on rebuttal warrants a reversal. (See *People* v. *Byrd*, *supra*, 42 Cal.2d 200, 212; *People* v. *Avery*, *supra*, 35 Cal.2d 487, 491.)

### Constitutionality of Sections 1016 and 1026 of the Penal Code Providing for Bifurcated Trials on Issue of Insanity

At the inception of the trial, the deputy district attorney, while in chambers with the trial judge, the defendant, and defendant's counsel, announced his intention to question the prospective jurors on their attitudes toward pleas of not guilty by reason of insanity. Defendant claimed the right to have a separate panel try the insanity issue and urged that defendant would be prejudiced by such *voir dire* examination. The trial court said that this was the only time that the jury could be so interrogated. Defendant then withdrew his plea of not guilty by reason of insanity. Defendant contends that he was forced to make this election because the jury, if so questioned, could only have gained the impression that he was guilty. He sees a denial of due process and of a fair trial because a defendant is required, in the discretion of the court, to submit the issue of insanity to the same jury which passed on the question of guilt (Pen. Code, §§ 1016, 1026) and which might not be impartial.

However, it has long been held that the proper time for the examination of the prospective jurors on the issue of insanity is during their selection at the beginning of the trial. (*People* v. *Woods*, 19 Cal.App.2d 556, 558 [65 P.2d 940]; *People* v. *Foster*, 3 Cal.App.2d 35, 39 [39 P.2d 271]; *People* v. *Davis*, 94 Cal.App. 192, 197 [270 P. 715].)

With regard to his assertion that the same jury could not approach the insanity issue objectively, the following language employed by this court in *People* v. *Leong Fook*, 206 Cal. 64, 78 [273 P. 779], is significant: "We must assume that a fair and impartial jury of intelligent men and women would obey . . . [their] instructions and would therefore hold in reserve their ultimate finding upon the issue of the defendant's sanity until that separate issue and the evidence supporting it had, in the prescribed order of the trial, been committed to it for determination. We are not to assume that such a jury will cease to be fair and impartial as the cause progresses upon its successive issues, but, on the contrary, we must assume, in the absence of any other showing, that the jury has retained its attitude of fairness and impartiality under the changed procedure as before until the whole cause . . . has been determined." This answers defendant's basic premise that he would not have received an impartial trial on the insanity issue. Also, the same reasoning equally refutes defendant's supposition that the jury could

only believe that he admitted guilt by offering the plea of insanity. While these precise fair trial and due process arguments have apparently not been advanced before, it is important to note that sections 1016 and 1026 of the Penal Code have long been held constitutional despite many similar objections. (See *People* v. *Daugherty, supra,* 40 Cal.2d 876, 893, and the cases therein cited.)

Again we cannot say that the withdrawal of the insanity plea was "forced" upon defendant or that he was not sufficiently advised of the consequences of his decision. He was present in chambers when his attorney, the prosecutor, and the trial judge discussed the possible prejudicial effect of the challenged *voir dire* examination. In response to questions posed by his own counsel, he expressed his desire to withdraw his insanity plea and stated that he understood what had transpired. He was also informed that he could not reinstate the plea as a matter of right during the course of the trial. He might well have been additionally advised on other matters such as the nonbinding effect of the reports of the court-appointed alienists, defendant's right to examine these experts and to produce his own witnesses to controvert their reports, and the jury's power to make an independent determination. However, defendant was represented by counsel who initially entered this plea over his client's objections. Surely, he must have explained to defendant the reasons for his actions. They must have weighed the probabilities of success on this defense in the light of the unanimous opinions of the three alienists to the effect that he was sane. Defendant and his counsel evidently decided that his cause would be better served by avoiding what they conceived to be the harmful effects of the proposed examination of the prospective jurors than by actually pursuing the insanity plea. This was a "free and voluntary" choice made by defendant with full advice of counsel. (See *People* v. *Mendez,* 27 Cal.2d 20, 22 [161 P.2d 929].)

### Double Punishment

Defendant asserts that he suffered double punishment since he was sentenced for the kidnaping for the purpose of robbery and also for the robbery. However, it is not necessary to give extended consideration to this question. As we said in *People* v. *Chessman, supra,* 38 Cal.2d 166, 193: "Defendant is correct in his contention that punishing him separately for the violations of section 209 of the Penal Code (kidnaping) and for the robberies and sex crimes which, under the cir-

cumstances here, are essential parts of those violations, would amount to double punishment, which is forbidden by section 654 of the Penal Code. [Citing cases.] However, since defendant is subject to two [here five] validly imposed death sentences, no purpose would be served by reversal of other judgments of conviction. [Citing cases.]"

### Adequacy of Defendant's Representation by Counsel

The only entirely new point raised in the amicus curiae brief concerns the adequacy of the representation afforded defendant by the attorney whom he selected to conduct his defense in the trial court. Two aspects of his trial counsel's actions are specified as showing his lack of competence: His handling of the *voir dire* examination and his failure to object to some of the prosecutor's conduct. His courteous deportment toward the deputy district attorney is said to have prevented him from protecting defendant's rights. In handling the *voir dire* examination, he is said to have persistently emphasized that the prosecution's witnesses were all honest and positive in their identifications, and that the burden of proof was cast upon defendant to show his innocence beyond a reasonable doubt. Actually, he primarily stated that his client acknowledged that the acts were perpetrated and only contended that he did not commit them. His remarks could not possibly have had the untoward impact upon the jury attributed to them.

But even if we concede that defendant's attorney may not have used the best of strategy in handling the *voir dire* examination and in failing to challenge some of the prosecutor's remarks, defendant still has not made that type of showing which alone would compel us to conclude that he was deprived of due process within the meaning of the constitutional guarantees. (U.S. Const., 14th Amend., § 1.) The handling of the defense by counsel of the accused's own choice will not be declared inadequate except in those rare cases where his counsel displays such a lack of diligence and competence as to reduce the trial to a "farce or a sham." (*Lunce* v. *Overlade* [7th Cir.], 244 F.2d 108, 110; see also *Taylor* v. *United States* [9th Cir.], 238 F.2d 409, 413-414, cert. denied, 353 U.S. 938 [77 S.Ct. 817, 1 L.Ed.2d 761]; *United States* ex rel. *Feeley* v. *Ragen* [7th Cir.], 166 F.2d 976, 980-981; *Hendrickson* v. *Overlade* [N.D. Ind.], 131 F. Supp. 561, 562-564.) The record in this case does not even remotely approach such a situation. Defendant's sole defense lay in his claim that his

identification by the victims was incorrect. His counsel vigorously cross-examined the prosecution's witnesses to test their memories, and assiduously attempted to establish an alibi and to show defendant's good character. He at most committed what in retrospect may be claimed to be mistakes in judgment by following certain strategy employed. Such mistakes, if any, do not constitute a denial of due process. (*United States ex rel. Darcy* v. *Handy* [3d Cir.], 203 F.2d 407, 426, cert. denied sub nom. *Maroney* v. *United States ex rel. Darcy,* 346 U.S. 865 [74 S.Ct. 103, 98 L.Ed. 375].)

### Motion to Augment Record

 Defendant moves to augment the record pursuant to rule 12(a) of the Rules on Appeal by including a certified copy of the minutes of the municipal court before which the preliminary examination was conducted. That record is offered to show that defendant was not taken before the municipal court until nearly five days after his arrest. He claims that there was "unnecessary delay" (Pen. Code, § 849) and that his constitutional rights were thus violated, citing *Mallory* v. *United States,* 354 U.S. 449 [77 S.Ct. 1356, 1 L.Ed. 2d 1479]. However, rule 12(a) on which defendant relies, by its own terms, provides for augmentation only where the record was "offered at or used on the trial or hearing below and [was] on file in or lodged with the superior court." (Rules on Appeal, rule 12(a).) Here, defendant makes no showing that the minutes were ever used in the proceedings in the superior court or that they ever became a part of that court's records. (See *Estate of Hobart,* 82 Cal.App.2d 502, 510 [187 P.2d 105].) Further, it would serve no useful purpose to add the requested document to the record since defendant cannot claim for the first time on appeal, as he attempts here, that he was not seasonably brought before a magistrate. (*People* v. *Newell,* 192 Cal. 659, 669 [221 P. 622] ; *People* v. *Tennyson,* 127 Cal.App.2d 243, 246 [273 P.2d 593].) The motion must therefore be denied.

In conclusion, it should be stated that the voluminous record and briefs have been carefully examined because of the seriousness of the charges made against defendant and because of the nature of the penalty that has been imposed upon him. Such examination leads us to the conclusion that the evidence overwhelmingly showed that he was guilty of the long series of despicable crimes with which he was charged. We further conclude that defendant was accorded a fair trial, and that

there were no errors or other irregularities in the proceedings which would warrant a reversal.

The motion to augment the record is denied. The judgments and the order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and McComb, J., concurred.

CARTER, J.—I dissent on four grounds:

(1) The majority has misconstrued the meaning of the word "kidnaps" as it is used in Penal Code, section 209;

(2) The term "carries away" is so ambiguous within the context of section 209 as to be meaningless;

(3) The misconduct of the prosecutor in his summation was prejudicial to defendant in the matter of the sentence determined by the jury;

(4) The majority has affirmed the infliction of a penalty so excessive in relation to the defendant's acts as to transgress the constitutional provision condemning punishments which are cruel or unusual. (Cal. Const., art. I, § 6.)

The jury found the defendant had done these acts:

(1) He seized M. M. and tied her hands behind her with wire. He held a knife in her back while she searched for her billfold. Then he ordered her to crawl through her house to the bedroom. There he robbed her of $17 or $18, raped her, and forced her to an act of fellation. He forced her to move altogether about 75 feet under duress.

(2) He seized L. S. and bound her hands with wire. He dragged her by the hair 3 or 4 feet into a bedroom, then threw her 2 or 3 feet onto the bed. He raped her, forced her to an act of fellation and cut her with his knife. He then dragged her into a second bedroom an unstated distance away and locked her in a closet. He stole $200 in cash and a $4,000 money order.

(3) He seized C. F. in her bedroom and bound her hands with wire. He asked her for her money. She said she had $10 in the kitchen but he did not look for it. He did not take the $1.00 he found in her billfold. Then, to quote the victim, ". . . he helped me up on the bed." The distance was 4 or 5 feet. He then raped her and forced her into perversion.

(4) He seized L. B. in her bedroom and bound her hands with wire. He took valuable jewelry and $30 to $40 in cash. He forced her to walk back about 12 feet to a daybed, and,

when she complained of, discomfort, he told her to get up and pushed her 4½ or 5 feet to a chair. Then he raped her.

(5) He seized and bound the hands of U. H. in her living room. He said he was going to rob her and she said, " 'Here is everything I have, go ahead and take it.' " She wore jewelry and her purse was on a sofa in the same room. But he took nothing. He pushed her to the floor 5 feet away in the center of the room and forced her into perversion.

For these acts defendant was convicted on three counts of first degree robbery (Pen. Code, § 211a), four counts of rape (Pen. Code, § 261, subd. 3), four counts of sex perversion (Pen. Code, § 228a), and five counts of kidnaping with intent to rob and causing bodily harm (Pen. Code, § 209).* The penalty for first degree robbery is not less than five years in the state prison; for rape it is not less than three years in the state prison; for perversion it is not more than 15 years in state prison or not more than one year in the county jail. The judgment was for the term prescribed by law, the terms to run consecutively. The penalty for kidnaping with intent to rob where bodily harm is done to the victim is life imprisonment without the possibility of parole or death. The choice is discretionary with the jury. The jury decided that Wein should die.

The jury also found that defendant did these acts:

(6) He seized and bound K. S., aged 15, shoved her 2 feet into a bedroom, raped her and violated Penal Code, section 288a. Afterwards she walked 8 feet at his command.

(7) He seized and severely beat A. C. He moved her 13 feet into a closet and fled.

(8) He and an accomplice seized A. H. and "dragged her

---

*"Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps, or carries away any individual by any means whatsoever with intent to hold or detain or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from relatives or friends of such person any money or valuable thing, or any person who kidnaps or carries away any individual to commit robbery, or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm.

"Any person serving a sentence of imprisonment for life without possibility of parole following a conviction under this section as it read prior to the effective date of this act shall be eligible for a release on parole as if he had been sentenced to imprisonment for life with possibility of parole." (Pen. Code, § 209.)

out onto the floor,'' a distance of about 3 feet. Defendant raped her and committed the perverse act.

For these acts defendant was convicted on two counts of rape, two counts of sex perversion, and two counts of kidnaping as defined by Penal Code, section 207.*

Assuming the jury was correct in its factual findings, the defendant is guilty of the most perverse and outrageous crimes and should be punished severely and with little mercy.

However, it is my conclusion that the defendant did not violate Penal Code, sections 209 or 207, and, assuming *arguendo* that he did, the penalty of death is excessive to the point of barbarity.

THERE WAS NO VIOLATION OF PENAL CODE SECTIONS 209 OR 207

Since 1901 there have been two kinds of kidnaping in California. Section 207 was enacted in 1872 and codified the common-law definition. The section originally required that the victim be carried across a county or state line to constitute kidnaping. In 1905 the Legislature inserted the words ''. . . or into another part of the same county . . .'' making it possible to kidnap a victim without crossing a county line. (Stats. 1905, chap. 493, p. 653.)

The Legislature enacted section 209 in 1901. It then provided: ''Every person who maliciously, forcibly, or fraudulently takes or entices away any person with intent to restrain such person and thereby to commit extortion or robbery, or exact from the relatives or friends of such person any money or valuable thing, is guilty of a felony, and shall be punished therefor by imprisonment in the state's prison for life, or any number of years not less than ten.''

There was no use of the word ''kidnaping'' in the enacting legislation (Stats. 1901, chap. 83, p. 98, § 1). This section

---

*''Every person who forcibly steals, takes, or arrests any person in this state, and carries him into another country, state, or county, or into another part of the same county, or who forcibly takes or arrests any person, with a design to take him out of this state, without having established a claim, according to the laws of the United States, or of this state, or who hires, persuades, entices, decoys, or seduces by false promises, misrepresentations, or the like, any person to go out of this state, or to be taken or removed therefrom for the purpose and with the intent to sell such person into slavery or involuntary servitude, or otherwise to employ him for his own use, or to the use of another, without the free-will and consent of such persuaded person; and every person who, being out of this state, abducts or takes by force or fraud any person contrary to the law of the place where such act is committed, and brings, sends, or conveys such person within the limits of this state, and is afterwards found within the limits thereof, is guilty of kidnaping.'' (Pen. Code, § 207.)

was not meant to redefine kidnaping. The word first appears in Deering's Penal Code, 1906 edition, in the heading of the section. The Legislature first referred to violations of section 209 as kidnaping in 1933 in the descriptive heading to an amendment to that section (Stats. 1933, chap. 685, p. 1757). These headings are not enacted into law. That amendment read: "Every person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or robbery or to exact from relatives or friends of such person any money or valuable thing, or who aids or abets any such act, is guilty of a felony and upon conviction thereof shall be punished by life imprisonment without possibility of parole in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm inflicted by such kidnapers; or by life imprisonment with possibility of parole in cases where there is no violence and upon the recommendation of the trial jury or in the discretion of the trial judge."

The verb "kidnaps" was included in the definition of the crime defined by section 209. It cannot be assumed the Legislature meant to define the section 209 crime by itself by using this word. The word must be construed to have a meaning apart from and narrower than the crime defined by section 209. There are two possibilities: (1) It meant common law kidnaping; or (2) it meant kidnaping as defined in section 207. Since the Legislature had already rejected the common-law definition of kidnaping and redefined it, the clear implication is that the word "kidnaps" in section 209 means kidnaping as defined in section 207. This is the contention of the attorney general in his brief in this case.

Section 209 was interpreted from 1933 to 1951 to encompass the act of robbery (for example, *People* v. *Knowles,* 35 Cal.2d 175 [217 P.2d 1]; *People* v. *Brown,* 29 Cal.2d 555 [176 P.2d 929]). This permitted prosecutors to demand the death sentence successfully for second degree robbery in cases where accompanying crimes outraged the jury. In 1951, the Legislature amended section 209 to its present form. (Stats. 1951, chap. 1749, p. 4167.) (See Pen. Code, § 209, quoted on page 345 of this opinion.) The 1951 amendment declared that section 209 was violated to commit robbery only where the perpetrator "kidnaps or carries away" his victim. These facts point to the conclusion that defendant in this case is

not guilty of violating section 209 unless he either kidnaped a victim as defined by section 207 or "carried her away."

*Kidnaping under section 207.* Before 1905 Penal Code, section 207, required the victim to be carried outside the county before there was a kidnaping. In *Ex parte Keil,* 85 Cal. 309 [24 P. 742], defendants forced two victims from their boat in San Pedro harbor and took them under duress to Santa Catalina Island. Defendants were held not guilty of kidnaping because both the island and San Pedro are in Los Angeles County. According to the code commissioner's notes cited in West's Annotated Penal Code, sections 1-260, page 622, the 1905 amendment was advisable because of the Keil decision. No other reason is advanced for the amendment than to remove the Keil aberration. This history of section 207 implies that the Legislature was still contemplating kidnaping in terms of movements over considerable distances. The words themselves clearly imply this. If the amendment were intended to include movements of three feet the Legislature would have amended the section by using words designating such minute movements. This is what it did in 1933 when it added such words as "seize" and "confine" to section 209. Significantly, it did not alter the section 207 definition of kidnaping at the 1933 session. It meant only to make more inclusive the false imprisonment of persons for extortion, ransom, and robbery, and therefore amended section 209 only. It is also significant that when the Legislature amended section 207 in 1905 it did not alter or abolish section 236 which defines the crime of false imprisonment as "the unlawful violation of the personal liberty of another." It appears that section 236 was aimed to punish violations of liberty not gross enough to be described as a carrying into another part of the same county.

Almost all of the California cases which review convictions under section 207 concerned asportations over considerable distances, usually many miles. All of them involved greater distances than are represented by the kidnaping of which Wein was convicted. None of them involved asportations entirely within one enclosed place. In all of them the asportation was from a place where the intended ancillary crime was difficult of consummation to a place where it was more easily done. This was not so in Wein.

Three cases affirmed convictions under section 207 in which the asportation was not great. In none of them was the issue of distance discussed by the court. All of them were decided

after *People* v. *Tanner*, 3 Cal.2d 279 [44 P.2d 324], which associated the term "kidnaping" with the short-haul abduction in that case. Tanner was convicted under section 209.

In *People* v. *Hunter*, 49 Cal.App.2d 243 [121 P.2d 529] (1942), defendant dragged one victim 60 yards and another across a railroad track to a pile of ties to rape them. In *People* v. *Cook*, 18 Cal.App.2d 625 [64 P.2d 449] (1937), defendant grabbed his victim as she walked in front of his house and dragged her inside to rape her. In *People* v. *Thompson*, 133 Cal.App.2d 4 [284 P.2d 39] (1955), defendants forced their victim into their car and drove him about one and one-half blocks to rob him. The court relied on *People* v. *Chessman*, 38 Cal.2d 166 [238 P.2d 1001], for this holding.

A consideration of *People* v. *Tanner, supra,* 3 Cal.2d 279, and *People* v. *Knowles, supra,* 35 Cal.2d 175, is important at this point. Both were decided on the basis of the 1933 amendment to section 209. In *Tanner,* defendants seized several members of a household and forced them to move about the house for some hours. In *Knowles,* defendants forced two store clerks to walk to a storeroom and one of them to return to the front of the store, then return to the rear. An examination of the language in these cases reveals that neither Mr. Justice Seawell in *Tanner* nor Mr. Justice Traynor in *Knowles* relied on the terms "kidnaps or carries away" to describe defendants' acts. In *Tanner* Mr. Justice Seawell makes it clear that section 209 is not the same crime as kidnaping in section 207. At page 293 he says, regarding the 1901 act: "It will be noted that the *forcible taking* of any person with intent to commit extortion or robbery, the *exact offense* of which the defendants were convicted, is made a felony. The only change made by the amendments of 1933 [adding *inter alia* "kidnaps or carries away"] *so far as they affect the instant case* was to increase the penalty if the person forcibly taken suffers bodily harm." (Emphasis added.) This means that defendants could have been convicted under the 1901 act *before* the words "kidnaps or carries away" were added.

Defendants in Tanner attacked the great departure section 209 made from the common-law definition of kidnaping. At page 296 Mr. Justice Seawell says: "No reason had been given why it is not within the purview of the sovereign power of the state to pronounce or classify as an act of kidnaping (following closely the language of the statute), the act of

seizing and *confining* a person by *any means whatever. . . .*"
(Emphasis that of the court.) The Tanner case therefore
does not bear on the meaning of kidnaping as defined by sec-
tion 207.

The Knowles decision is even clearer in its reliance on terms
other than "kidnaps or carries away." Mr. Justice Traynor
cites Tanner at page 184: "On appeal from their conviction
under section 209, they [Tanner et al.] contended that their
offense was only armed robbery and that the Legislature did
not intend to punish it under a kidnapping statute. The
court affirmed the conviction, holding that the Legislature is
empowered to define criminal offenses as it sees fit and that
the statute clearly indicates an intention to punish *standstill*
kidnapping under its provisions. It is suggested that under
the statute there must be movement of the victim, under a
preconceived plan for protracted detention to obtain property
that would not be available in the course of ordinary armed
robbery. Defendant seeks to read into the statute a condition
that the victim be moved a substantial distance. The statute
itself is a refutation of that contention. Movement of the
victim is only one of several methods by which the statutory
offense may be committed. The statute provides that 'Every
person who *seizes, confines* . . . or who *holds* or *detains* [any]
individual . . . to commit extortion **or robbery** . . . **is guilty** of
a felony.' " (Emphasis added.)

These cases left the terms "kidnaps" and "carries away"
unconstrued within the context of section 209. In determin-
ing the movement necessary to constitute a violation of section
209, all cases relied on Tanner or Knowles.

After the 1951 amendment here under consideration, this
court held in *People* v. *Chessman,* 38 Cal.2d 166 (see p. 192)
[238 P.2d 1001] that defendant's act of transporting a victim
22 feet was within the compass of "kidnaping or carrying
away" in section 209. The majority did not analyze the mean-
ing of the terms in that opinion but rather relied on these
authorities:

(1) *People* v. *Raucho,* 8 Cal.App.2d 655 [47 P.2d 1108].
This case was decided in 1935 under the broad 1933 amend-
ment to section 209 and the court cited **Tanner as its authority**
that there is no distance requirement under section 209.

(2) *People* **v. *Cook,*** 18 Cal.App.2d 625 [64 P.2d 449],
decided in 1937, raised no issue of distance.

(3) *People* v. *Melendrez,* 25 Cal.App.2d 490 [77 P.2d 870],

was a case strictly within the confines of section 209 before 1951.

(4) *People* v. *Shields*, 70 Cal.App.2d 628 [161 P.2d 475], decided in 1945, involved a defendant who carried a child an unstated distance to the roof of an apartment from a point in the neighborhood. The issue of distance was not raised.

(5) *People* v. *Oganesoff*, 81 Cal.App.2d 709 [184 P.2d 953] (1947), in which defendants forced a woman into their car, drove her from Compton to Torrance, and forced her into a house.

(6) *Cox* v. *State*, 203 Ind. 544 [177 N.E. 898, 181 N.E. 469] determined an asportation of 90 feet was sufficient under a statute not similar to Penal Code, section 207. Asportation " '*from* any place within this state' " was made punishable (§ 2426, Burns 1929 Supp.). This patently refers to shorter distances than the terms "into another part of the same county" in section 207. The Indiana statute relates the taking to the place where the taking *begins*; section 207 refers to the place where it *ends*.

(7) *State* v. *Taylor*, 70 N.D. 201 [293 N.W. 219], held a short-haul asportation to be within a kidnaping statute substantially similar to section 209, in that it employs the words "seized, confines, inveigles, or kidnaps" to describe the crime. The term "kidnap" is not elsewhere described in North Dakota statutes. This case cites *People* v. *Melendrez, supra,* 25 Cal.App.2d 490, as authority for its own holding.

Therefore only two of these cases, Cook and possibly Shields, furnish authority for the proposition that short-haul asportation satisfies section 207. And the issue of whether or not the asportations were sufficient under the section was never before the courts.

It is therefore my opinion that this court should reexamine its construction of the word "kidnaps" as used in section 209 and define it as it was meant to be defined by section 207.

Another consideration ignored by the majority is this: The patent intent of the Legislature in amending section 209 in 1951 was to remove simple robbery from the bounds of section 209. Previously, simple robbery invariably constituted short-haul kidnaping (see "Robbery Becomes Kidnaping," 3 Stanford L. Rev. 156, a note on *People* v. *Knowles, supra,* 35 Cal. 2d 175). This legislative intent was followed by Mr. Justice Vallée in reversing a conviction in *People* v. *Taylor,* 135 Cal. App.2d 201 [286 P.2d 952]. The case which stimulated the Legislature to action was *People* v. *Knowles, supra,* 35 Cal.2d

175. It is important to note that victims were forced to move in that case and this constituted short-haul kidnaping. In *People* v. *Chessman*, 38 Cal.2d 166 (see p. 192) [238 P.2d 1001], this court held the Knowles problem was not solved by the 1951 amendment. As a result of Chessman and the instant decision, while robbery is not *per se* a violation of section 209, if the robber moves his victim *one inch* he is subject to the death penalty. This can hardly be described as giving force to the legislative act.

Lastly, if it is possible without doing violence to its words, a statute is to be construed to have a constitutional application. The majority have construed it to provide the death penalty for *de minimis*. This is within the compass of cruel and unusual punishment and such a construction should be avoided. Section 4 of the Penal Code directs the courts to construe its provisions according to the *fair* import of their terms, with a view to effect its *objects* and to promote *justice*.

I conclude that defendant has not been guilty of kidnaping within the purview of either section 207 or section 209 and the convictions and judgments thereof must be reversed and the counts of the information alleging them stricken.

## The Phrase "Carries Away" Is Ambiguous

Even if defendant did not "kidnap" his victims, he would still be guilty of violating section 209 if he "carried away" any one of them. We must therefore scrutinize the phrase "carries away" in section 209.

If we were to say that to "carry away" meant no more than to cause a victim to move one foot we should necessarily include the more rigidly defined term "kidnap," since any act constituting "kidnaping" would also constitute "carrying away." This would make "kidnaps" redundant in section 209. "To carry away" must therefore differ from "to kidnap" in some way other than in the distance required to consummate the crime. But the statutes and cases of California establish no clue as to the acts which deserve this label. The brief of the attorney general does not attempt to assist us.

Penal Code, section 7, subdivision 16, states: "Words and phrases must be construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, must be construed according to such peculiar and appropriate meaning. . . ."

Webster's Unabridged Dictionary defines "carry away"

thusly: "a To remove from life [refers to death]; . . . c To take possession of the mind; to move, sway, or charm; to delude; as, to be *carried away* by music, or by temptation . . . d To succeed in obtaining; to be victorious in or over; to win; also, *Obs.*, with *it*, to gain the victory; carry the day."

These definitions do not fit the factual context of the instant case, nor do they appear to have any meaning relative to any forced movement of a person.

The word "away" is defined thusly by Webster: "1. On the way; onward; along. 2. From a place; hence; thence;—of motion; as, go *away*; . . . 4. a From contact or close association; aside; off . . . 5. From one's possession;—with a sense of parting or loss; as, to give one's heart *away*. . . ."

Meaning 2. of away, "From a place" may be relevant. Still, the term "place" is unclear since it may be used in such contexts as "To move away from the window," or "to move away from home." Its meaning as to distance is entirely contextual. To give it a meaning outside a context, as the Legislature has attempted to do, is meaningless. "Away" begs us to answer the query "from what?"

Blackstone says that larceny required a "carrying away." (Jones, *Blackstone*, p. 2440.) This element was satisfied by the slightest movement of the item to be taken. The essence of this common law crime was disturbance of possession and the movement of the property had to be accompanied by an intent to terminate the possession permanently. To rip a phrase from a finely woven context would make a crude patchwork of the statute. The disturbance of possession of personalty bears little resemblance to the deprivation of human freedom. They are different social menaces and terms used to describe them necessarily find themselves in dissimilar contexts playing semantical tricks on the unwary. I conclude that the technical meaning of "carries away" is relevant only to the context of personal property law and has no commonly recognized technical application to the realm of crimes against liberty.

The vernacular usage of the term may provide help. Suppose one says, "X carried Y away." What image arises in the mind of the hearer: Certainly not a picture of X forcing Y to move about a few feet in his own home. Or suppose one wished to describe X's forcing Y to move from one room to another. Many descriptive words and phrases come to mind before "X carried Y away." For example, "X forced Y to

move against his will.'' The word ''away'' just does not fit the facts. If the Legislature intended to include all forced movements within its definition of section 209 kidnaping for robbery, a simpler and clearer term would have been used. This is particularly true in view of the consternation raised by the decision in *People* v. *Knowles, supra.* The allusion to the command of Penal Code, section 4, is also pertinent here.

It is apparent that the 1951 amendment was enacted to assuage the mischief of the Knowles holding. In this context, this intent should not be construed into oblivion. And it certainly does not promote justice to hold that the movement of a person four feet is an offense sufficient to warrant the death penalty when the statute is open to another less strict interpretation.

I conclude that the phrase ''carries away,'' as used in section 209, is undefined and meaningless; and that to hold that it encompasses defendant's acts is to misconstrue it violently.

## THE PREJUDICIAL MISCONDUCT OF THE DEPUTY DISTRICT ATTORNEY

While the weight of the evidence is so massive against the defendant that I cannot say the prejudicial misconduct of the deputy district attorney was instrumental in the jury's finding defendant guilty, I am of the opinion that this misconduct was probably a major influence in the jury's decision to fix the penalty at death. In other words, this misconduct prejudiced defendant's chances to receive a life sentence rather than death:

(1) He identified defendant with Caryl Chessman and reminded the jury repeatedly that unless defendant were executed he might be released to commit other sex crimes. He stated that Chessman had been paroled before committing the more publicized crimes of which he was accused. This must have carried considerable weight in the jury's consideration of the penalty. Yet, defendant and not Chessman was on trial, and defendant was entitled to have his case determined on the record of his own trial.

(2) The inflammatory ephithets used to describe defendant must have had an emotional effect on the minds of the jurors. Powerful words, portraying the images and associations they conjure, participate actively in forming human judgments. In a trial as emotionally conceived as this one was, they are particularly decisive. No objection or admonition could cure this psychological onslaught: Once spoken, the emotional impact of the words was locked in the minds of its hearers. The

cases cited by the majority to justify requiring an objection, involve the failure to object to evidence. An admonition to ignore certain testimony in reaching a factual conclusion in a logical manner may be effective. But it is far harder to blot out an emotion or a vivid image from the mind of a juror. In this case I do not think it would have been possible. It has been truly said: "You can't unring a bell."

### THE PENALTIES INFLICTED IN THIS CASE CONSTITUTE PUNISHMENTS WHICH ARE CRUEL OR UNUSUAL

Consider the precise acts for which this court is affirming the death penalty. Defendant seized and bound the hands of C. F. She told him where her money was but he took none. He helped her onto a bed 4 or 5 feet away and forced her to perform sex acts. He was clearly guilty of rape and perversion. The penalty for rape is not less than three years in the state prison. For perversion it is not more than 15 years in the state prison or less than one year in the county jail. These were brutal and revolting acts. But for moving C. F. 4 or 5 feet, "helping" her to the bed, he is to be executed. But for this movement he would not have received the death penalty! The case involving U. H. is similar except that he did not rape her. Defendant committed the same atrocities on A. H. as he did on C. F. and in fact did more harm to her than to U. H. But in attacking A. H. he merely threw her to the floor and raped her and committed perversion. But his penalty for this was not death, but two prison terms! Why? Because he did not move her the necessary *one inch* nor incidentally ask for her money! Of the condemned movements one must ask: What difference did they make? The answer: None.

The above comparisons reflect the absurd position into which this court has backed by following the Tanner, Knowles and Chessman cases to the consistent but irrational ultimate. Holmes' epigrammatic "A page of history is worth a volume of logic" has found its supreme justification.

In each of the other three situations involving the death penalty, if the victim had not been moved a few feet there would be no death penalty possible. Under the rule of this case a robber who shoves his victim against a wall is eligible for the gas chamber if a prosecutor arbitrarily chooses to ask for that penalty. Essentially section 209 may be used by a zealous prosecutor to kill one who has committed other more socially condemned crimes which carry less severe penalties.

The instant case is the archetype. The deputy district attorney prosecuting Wein did this overtly. In his summation he demanded the death penalty not for defendant's moving his victims but for the sexual assaults he made upon them. He cited the military law which inflicts the death penalty for rape. He belabored the lecherous acts allegedly done to L. S., then said: "If this is not treatment which earns this defendant the extreme penalty of death, I never saw any. There is not a red blooded man on this jury, there isn't a respectable woman on this jury who in my opinion would say otherwise." His only reference to the movement of L. S. was: "He moves her; that is kidnapping for the purpose of robbery, as I explained it to you here. . . ." He also said: "I have only one regret in arguing this case to you, and that is that under the law of this state, for the reason that the defendant did not announce as his purpose robbery at any time to K. S., that I cannot charge him with kidnapping for the purpose of robbery with bodily harm and ask you to return a sixth verdict of death."

I conclude that the defendant is in effect, being condemned to death for *de minimis* acts. Were the case before me, I should also say imprisonment for life or a long term of years would also fall within the scope of cruel or unusual punishment.

This court properly refuses to "draw lines" delineating what distance is sufficient to constitute kidnaping. It is the task of the Legislature. The Legislature attempted by its 1951 amendment to do this and failed to communicate its intent to this court. The court has chosen to label all short-haul asportations "kidnaping." The holding in this case that an asportation of four feet is sufficient to send a man to the gas chamber illustrates in unshaded tones that *all* short-haul asportations must be declared without sections 207 and 209 or not punished by the courts.

This does not mean that no violation of section 207 or section 209 should be punished in the degree determined by the Legislature. It means that the penalties assessed *in this particular case* are too severe because the statute, as construed by the majority, is overly broad. While precise lines must be drawn by the Legislature, the penalties assessed for the alleged offenses in this case are blatantly on the forbidden side of it. The judiciary may not abdicate its responsibility to condemn a violation of constitutional powers with a question-begging cliche about separation of powers.

Mr. Justice McKenna, writing for the Supreme Court in *Weems* v. *United States,* 217 U.S. 349, at 378 [30 S.Ct. 544, 54 L.Ed. 793], faced this problem squarely:

"We disclaim the right to assert a judgment against that of the Legislature of the expediency of the laws or the right to oppose the judicial power to the legislative power to define crimes and fix their punishment, unless that power encounters in its exercise a constitutional prohibition. In such case not our discretion but our legal duty, strictly defined and imperative in its direction, is involved. Then the legislative power is brought to the judgment of a power superior to it for the instant. . . . They have no limitation, we repeat, but constitutional ones, and what those are the judiciary must judge."

Mr. Chief Justice Warren described clearly the problem of definition: "This Court has had little occasion to give precise content to the Eighth Amendment, and in an enlightened democracy such as ours, this is not surprising." (*Trop* v. *Dulles,* 26 Law Week 4219 at 4223.)

The cases facing this problem of definition may be divided into four groups:

(1) Those in which the penalty was found not excessive in relation to the offense;

(2) Those in which the court held the Legislature free to prescribe even outrageous penalties;

(3) Those holding the phrase "cruel and unusual punishment" refers only to uncivilized forms of punishment such as quartering;

(4) Those holding punishment clearly disproportionate to the offense to be unconstitutionally cruel, unusual, or both.

The problem in California is simpler than that faced by the federal courts, since our guarantee is stated disjunctively: "Excessive bail shall not be required, nor excessive fines imposed; nor shall cruel *or* unusual punishments be inflicted." (Cal. Const., art. I, § 6.)

I believe the most persuasive authority supports my judgment that clearly excessive punishments are unconstitutional.

The defendant in *Weems* v. *United States, supra,* 217 U.S. 349, received a statutorily mandatory sentence of 12 years at hard labor in irons plus the permanent loss of many civil rights for falsifying two entries in an official cash book. Mr. Justice McKenna says of this sentence at page 377:

"It is cruel in its excess of imprisonment and that which accompanies and follows imprisonment. It is unusual in its character. Its punishments come under the condemnation

of the bills of rights, both on account of their degree and kind.''

Chief Justice Warren continued in *Trop* v. *Dulles, supra,* 26 Law Week 4219 at 4223, concerning the Weems decision:

''The Court recognized in that case that the words of the Amendment are not precise, and that their scope is not static. The amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.''

In *O'Neil* v. *Vermont,* 144 U.S. 323 [12 S.Ct. 693, 36 L.Ed. 450], the court held the Eighth Amendment does not inhibit state action. The defendant was sentenced to 54 years in prison for sales of liquor during a single day. Justices Field, Harlan and Brewer dissented on the ground that the Fourteenth Amendment gave the Eighth Amendment protection against the states. They agreed that the inhumane sentence in this case contravened the Eighth Amendment.

Two compelling reasons for condemning excessive sentences are stated in *Cox* v. *State,* 203 Ind. 544 [177 N.E. 898, 181 N.E. 469, at 471]. The court quotes *United States* v. *Borromeo,* 23 Philippine 279 at 289:

''A contrary view leads to the astounding result that it is impossible to impose a cruel and unusual punishment so long as none of the old and discarded *modes* of punishment are used; and that there is no restriction upon the power of the legislative department, for example, to prescribe the death penalty by hanging for a misdemeanor, and that the courts would be compelled to impose the penalty. Yet such a punishment for such a crime would be considered extremely cruel and unusual by all right-minded people.''

At page 472 the Indiana court in *Cox* v. *State,* 203 Ind. 544 [177 N.E. 898, 181 N.E. 469], suggests that the reason the issue of a punishment's cruelty and unusualness is not often before the appellate courts is that juries are so constituted as to find persons innocent when the punishment for an alleged offense offends their sense of justice. Obviously this element could not sway the jury so to favor a defendant whose sex crimes cried for vengeance.

The finest exposition of the doctrine of unconstitutional excessiveness is *State* v. *Ross,* 55 Ore. 450 [104 P. 596, 42 L.R.A.N.S. 601]. Defendant was sentenced to five years in the state prison and fined $576,853.74 for embezzling $288,-426.87 in state funds. He was to be imprisoned in the county jail until the fine was paid, but not longer than 288,426 days

or approximately 790 years. The court reversed the sentence of imprisonment for nonpayment of the fine on the ground that it was cruel and unusual punishment.

There is language in California cases upholding this position. *Ex parte Karlson,* 160 Cal. 378, at 383 [117 P. 447, Ann. Cas. 1912D 1334], said the danger that persons imprisoned for contempt were protected against excessive restraint by the constitutional rule against cruel or unusual punishments.

In *In re Finley,* 1 Cal.App. 198 [81 P. 1041], the court rejected arguments that excessive sentences were not unconstitutional, but held the death penalty for an assault by a life convict was justified. The court said at pages 201-202:

"It is only when the punishment is out of all proportion to the offense, and is beyond question an *extraordinary penalty* for a crime of *ordinary gravity committed under ordinary circumstances,* that courts may denounce it as *unusual.*"

*Contra* this position is *In re O'Shea,* 11 Cal.App. 568 [105 P. 776], which contains a dictum, at page 575, that only punishments of a barbarous character, like quartering, are cruel and unusual. (The court used the conjunctive.)

There is language in *People* v. *Tanner, supra,* 3 Cal.2d 279, at 298, which may be read to mean that the death penalty for kidnaping is not excessive. But it is insufficient to paste a label to an act and justify enormities by it. This illustrates the profundity of the insight: "What's in a name?" It is tantamount to playing categories with human life. Moving a person four feet does not justify taking life no matter what words describe the act.

Other cases which uphold the proposition that excessiveness is fatal to a sentence are: *Application of Cannon,* 203 Ore. 629 [281 P.2d 233] (life imprisonment for assault to commit rape held cruel and unusual); *State* v. *Devore,* 225 Iowa 815 [281 N.W. 740, 118 A.L.R. 1104] (imprisonment until fine paid held cruel and unusual); *Williams* v. *State,* 125 Ark. 269 [188 S.W. 826] (sentence to solitary confinement for a misdemeanor held cruel and unusual); *State* v. *Whitaker,* 48 La. Ann. 527 [19 So. 457, 35 L.R.A. 561] (sentence of six years for destroying plants held cruel and unusual); *State* v. *Driver,* 78 Kenan's N.C. Repts. 366 (N.C.) (imprisonment in county jail for five years and recognizance of $500 to keep the peace for five years thereafter for assault and battery held cruel and unusual); *Sinclair* v. *State,* 161 Miss. 142 [132 So. 581 at 582, 74 A.L.R. 241] (two justices' concurring opinion said sentencing an insane person to life imprisonment is

cruel and unusual) ; *State* v. *Moilen,* 140 Minn. 112 [167 N.W. 345, 347, 1 A.L.R. 331] (a prison term flagrantly excessive would be cruel and unusual) ; *McDonald* v. *Commonwealth,* 173 Mass. 322 [53 N.E. 874, 875, 73 Am.St.Rep. 293] (imprisonment may be so long as to be cruel and unusual).

I conclude that the death penalties inflicted on this defendant for moving five victims from four to 75 feet cannot stand in the face of the constitutional mandate that cruel or unusual punishment may not be inflicted. The judgments must therefore be reversed. The acts of moving K. S. 10 feet and A. C. 13 feet are serious enough to warrant punishment. The minimum punishment prescribed for these acts, one year in the state prison, may not be excessive for them.

Appellant's petition for a rehearing was denied June 25, 1958. Carter, J., was of the opinion that the petition should be granted.